### STATE *v.* ROYAL S. CARR.

#### *Murder. Confession. Premeditation.*

1. Confession in a legal sense is, in effect, an admission of something which proves, or tends to prove, that the party making it was *himself* connected with the alleged crime, in a criminal or questionable manner; hence, admissions which tend to criminate a third party, are not within the rules of law, that exclude confessions, induced by promises and hope of favor.
2. When nothing else is wanting, no specific or particular length of time is necessary for premeditation to constitute murder in the first degree.
3. The statute has not altered the common law definition of murder. If the killing of a human being is premeditated, and with malice, it is murder in the first degree. *State* v. *Tatro,* 50 Vt. 483, approved.
4. It is for the jury to find from all the evidence whether the killing is murder, and if so, whether in the first or second degree.

THIS case was tried at the September term, 1879, REDFIELD, J., presiding. It was an indictment in five counts for murder of William W. Murcommock. Plea, not guilty; trial by jury; verdict, guilty of murder in the first degree.

It appeared that the dead body of said Murcommock was found on the 13th day of December, 1878, in the town of Calais, in said county of Washington, a few rods easterly of the town line of Worcester, in said county.

The evidence on the part of the State tended to show that said Murcommock was killed, at the place where his dead body was found, on the 11th day of December, 1878. The evidence against the respondent, tending to prove him guilty of said killing, was mainly circumstantial.

The counsel for the State claimed, and the evidence tended to show, that on the day on which the said Murcommock, who was an Indian, was killed, he, with the respondent, started from the dwelling house of one Chester Carr, to go into the forest, where the dead body of the Indian was afterwards found; that on the same day said Chester Carr had brought the Indian and his wife, a young woman, to his said dwelling house; that she remained at said dwelling house, when the respondent and the Indian started for the forest as aforesaid.

The counsel for the State claimed, that as a motive for the killing of the Indian by respondent, that he, the respondent, hoped by that means to obtain the Indian's wife for himself. The respondent claimed that it was Chester Carr, and not the respondent, who had improper designs upon the said Indian's wife; and that Chester by himself, or by some unknown person by his procurement, caused the death of the Indian.

It appeared that the respondent was arrested, on said charge of murder, on the 13th of December, 1878, by one A. A. Bliss, constable of said town of Worcester; and that pending the court of examination before the magistrate on said charge, said respondent was placed by said constable, in the custody of one Herbert Slayton as keeper, at said Worcester.

The State on trial offered as witness said Slayton, and offered to prove by said Slayton, certain conversation had between said

Slayton and said respondent, while the respondent was in the keeping of said Slayton as aforesaid, pending said examination ; which testimony was seasonably objected to by said respondent, on the ground that said Slayton, while acting as such keeper as aforesaid, gave said respondent to understand that the said respondent might expect favor from the State, from what he should say to said Slayton, as to said respondent's and one Chester Carr's connection with said crime ; but the court overruled said objection, and admitted said testimony, to which the respondent excepted—which testimony is as follows :

Herbert Slayton, called and sworn. Direct examination by Mr. Plumley:

Q. Whether you saw Royal Carr after he was arrested ? A. Yes, sir, I did.

Q. How soon ? A. Well, I stayed with him a part of the time, and guarded him. I believe I stayed with him two nights and two days part of the time.

Q. State whether during that time you had conversation with him about the manner of Mr. Murcommock's death, and the circumstances connected with it ? A. I talked with him considerable.

Q. State any instance you recollect ? A. I asked him one thing, what they got the Indian's wife down there for. He said that Chet said—

Mr. Heath.—We object to the witness relating any conversation he may have had with this respondent, when he was in charge of him. [To the witness] At the time you had this conversation you were keeping charge of Mr. Carr ? A. Yes.

Q. As a keeper over him, did you tell Mr. Carr anything about whether he had better, or had better not, tell what he knew about that business ? A. No.

Q. Nothing at all, no word like that ? A. I don't recollect now ; I think I didn't.

Q. You merely asked him questions ? A. I talked with him, the same as I talk with anybody that was in that place.

Q. Didn't you tell him, that if he had anything to do about it, it would be better for him to let it be known ? A. I told him if he knew anything about Chet, if Chet had anything to do with it, he had better tell about it ; he said he should never swear any murder against the Carr breed.

Q. Did you tell him, it would be better for him if he would tell just the whole facts about it ? A. Yes.

Q. Did you tell him he ought to tell the whole facts, if he knew anything about it? A. I did.

Q. You said it would be better for him, if he would let it be known, just the very truth. A. Yes. I told him if Chet had anything to do about it, it would be better to tell about it.

Q. Did you tell him anything else ? Did you tell him if he knew anything about it, it would be better for him to tell it ? A. No, I didn't tell him anything about himself.

Q. You merely told him, it would be better for him to tell, if he could tell anything about Chet ? A. Yes.

Q. Did you tell him why it would be better ? A. I told him perhaps it would make it easier for him.

Q. If he could tell anything about Chet, to tell it ? A. Yes.

Q. Did you tell him, it would be easier for him, if he could lay it to him ? A. Yes, I think I did.

Q. If he knew what had happened to the Indian, or anything about it, it would be better for him if he told it ? A. Yes.

\*      \*      \*      \*      \*      \*      \*      \*

The above questions, commencing with Mr. Heath's objection, were put by Mr. Heath. The following questions were put by REDFIELD, J.:

Q. I don't know as I understood exactly what you said to Royal Carr. He was in your custody. You had the care of him two days and two nights ? A. I believe so. It was two nights anyway and part of two days, or all of two days.

Q. I understand you say he said enough to you to show that he was casting the blame on to Chester ? A. Yes, sir.

Q. That at one time you say that you told him that if he knew anything about Chester's connection with this affair to state it. It was better for him to state it ? A. I did.

Q. Did you advise him to make any statement of his own connection with it, that it would be better for him to confess and state it ? A. I didn't, his own connection.

Q. You didn't ? A. I didn't. No.

Q. And all you said to him was, that any statement in connection with Chester's guilt or connection with this matter might better his own condition ? A. I did.

Q. And nothing more ? A. Nothing of any account.

Q. You didn't advise him as to his own connection with it ? A. No, sir, not as to his own connection with it.

It was claimed on the part of the State, and the proof tended to show, that Murcommock was first wounded, by a shot from respondent's gun in the back of the head, neck and right shoulder; second, by bullet from respondent's revolver, and entering the brain near the right ear, and then by three successive shots from the same revolver, through the heart and lungs of the deceased, entering the left side, and while the revolver was held near enough to the person of said Murcommock to scorch his clothing; and it was claimed on the part of the State that the said last three wounds were made after death had ensued.

This killing took place in an unfrequented place in the forest, with no one present except the parties to the affray.

The respondent's counsel claimed in argument to the jury, that from all that was shown in the case, even if the killing was done by the respondent as charged, intentionally, still such intention might have been formed only a moment before the killing; and that if they should so find, the jury should return a verdict for murder in the second degree.

The counsel for the State claimed, that the proof tended to show, that the killing was a deliberate killing; and that Murcommock was enticed into this unfrequented place in the forest, by the respondent, that he might commit the murder.

The respondent claimed on the trial, that the verdict of the jury should not be for murder in the first degree, but for murder in the second degree. The court on the question of degrees of murder charged the jury as follows:

#### EXTRACT FROM THE CHARGE OF THE COURT.

\*   \*   \*   .\*   Our statute requires you to say in your verdict, if you find the respondent guilty, whether the crime is in the first or second degree of murder. The respondent's counsel have argued to you, upon various considerations, and especially upon the ground of the weak intellect of the respondent, that your verdict, if guilty, should be murder in the second degree. The statute says: " All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate, or premeditated killing, or which shall be committed in perpetrating or attempting to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree;

and other kinds of murder shall be deemed murder of the second degree ; and the jury before whom any person shall be tried for murder, shall, if they find such person guilty thereof, ascertain in their verdict whether it be murder of the first or of the second degree ; but if such person shall be convicted on confession, in open court, the court shall proceed by examination of witnesses, to determine the degree of the crime and to ' give sentence accordingly.' "

Well, now, this was not perpetrated by poison, or by lying in wait, so far as any positive proof ; for it would seem by the nearness of the weapon to the body of this victim, that it was near, and that they were traveling together, so far as the tracks show. Was it by any other kind of willful, deliberate and premeditated killing ? The law, before this statute was passed, made many things murder, where the party did not intend and purpose to murder. The law of England was, and it has been so decided in this State, that if a man undertook to commit * * * intending to commit * * * he was a murderer. If a man went upon another's premises, and shot at his hens, and killed the owner, it was murder, though he intended only to kill an animal. The statute excludes all that from murder in the first degree. It makes murder by poison, which presumes a calculation from the mixing and preparation of the poison, or by lying in wait for one to come within his reach, and then kill him. That fact itself shows preparation, or in other words, willful, deliberate and premeditated killing. Now, the law does not require that a man should deliberate long in his mind, to prepare his mind to take the life of another. " Premeditated " means meditating beforehand. But if a man forms a purpose in his mind, and designedly take. the life of another, carries out that purpose, although it may be immediately before the act, if he deliberately forms the purpose and executes that purpose, by adopting mortal means to take the life of another, it is willful, and deliberate, and premeditated.

Now, if this respondent, if sensible at all of his crime, if he, while traveling with his comrade, formed the purpose to kill him, to get him out of the way, and discharged these gun-shots through his head and heart purposely, and intentionally, that is deliberate killing, malicious, intentional, premeditated.

To which charge of the court as aforesaid, the respondent excepted. Exceptions allowed, sentence respited, and cause passed to the Supreme Court. Exceptions allowed subject to amendment.

*Frank Plumley*, State's attorney, cited Wharton's Crim. Law, s. 686 ; *R.* v. *Baldry*, 12 Eng. Law & Eq. 591 ; 5 Cox C. C. 523; 2 Den. C. C. 430 ; *State* v. *Vaigneur*, 5 Richardson, 391 ; Archibald Crim. Pr. 9th Ed. 110 ; *State* v. *Grant*, 9 Shep. 171 ; 2 Russ. Crimes, 845 ; *R.* v. *Thomas*, 7 C. & P. 345 ; *U. S.* v. *Nott*, 1 M'Lean, 499 ; *State* v. *Kirby*, 1 Strobhart, 155 ; 1 Whart. Cr. Law, s. 688 ; 29 Penn. St. Rep. 429 ; *State* v. *Carr et. al.* 37 Vt. 195 ; *State* v. *Wentworth*, 37 N. H. 196.

*Heath & Carleton*, for respondent, cited, as to confessions, *State* v. *Phelps*, 11 Vt. 116 ; *State* v. *Walker*, 34 Vt. 296.

The opinion of the court was delivered by

BARRETT, J.   Whether the statement of the respondent, which the government was permitted to prove by the witness Slayton, was made under and by reason of promise of favor that induced the respondent to make it, was a question addressed to the court ; and the evidence bearing on that question was addressed to the court.   The finding of the court against the prisoner upon the evidence, and the admission of the testimony showing the statement, was not error in law, unless such finding was unwarranted by the evidence bearing on the alleged promise and inducement, as the result of which, it is claimed that the statement, or confession, as it is called, was made.

The only evidence bearing on that subject, was the testimony given by the witness on his direct examination by the prisoner's counsel, and by the presiding judge.   Did the evidence thus given show, that said statement was caused to be made by such promise of favor, or such representation of benefit to the respondent as would render it inadmissible ?

That testimony of Slayton does not show, that the respondent was asked or advised about telling anything in relation to himself, as connected with the murder, or with the murdered man, or his wife ; but only in relation to Chester.

It does show that what Slayton was seeking to elicit, was in relation to Chester ; and it was as to that, that he was saying to the prisoner, it would be better for him to tell ; and it was as to

that, that the prisoner understood Slayton to be asking. This is evinced by the reply he made, viz., that he should "never swear any murder against the Carr breed." Moreover, the evidence does not plainly show, that, in saying what he did, the prisoner understood himself, as making any confession, or stating anything that would make it better for himself in his then condition, having reference to the homicide.

What he said to Slayton, showed to Slayton, that he was casting the blame on Chester; not confessing, or designing to confess, or to say anything that would connect himself with the act, or crime of killing. So the case falls outside of the propositions of the law, and of the cases which exclude confessions or admissions, induced by promise and hope of favor and benefit. Inasmuch as any promise of favor, was on the score of his telling what he knew about Chester's connection with the matter, and not of his own, the idea of a confession or admission in the sense of the law, was not involved. Confession or admission, in that sense, means something, to the effect, that the party himself had some criminal, or questionable relation to the alleged crime. This is shown by all the books and cases in which it is treated.

We are not disposed to disturb, or question what was held in *The State* v. *Walker*, cited in the argument. This case, in what occurred between the witness and the prisoner, is at contrast, rather than in analogy with that.

The cross-examination that ensued, after the witness had testified to the prisoner's statement, did not bear on the legal propriety of thus admitting him to testify. That cross-examination bore only upon the credit and weight to be given by the jury, to his testimony, as to that statement. Without criticism of the manner of the examination and cross-examination of the witness in the prisoner's behalf, it occurs to remark, especially in view of the examination by the presiding judge, that courts are interested to know what witnesses wish, and mean to be understood by what they testify, and when that is discovered, application and effect are given to their testimony, according to their meaning, however much they may have become involved and obscure, in the course of the examination.

II. Exception to the charge. The evidence was all before the jury; and it was for them to find from it, whether the killing was by the respondent; and if so, whether the killing was murder, and if murder, whether it was in the first or the second degree. The only material evidence and facts reported to this court on the subject of *the degree*, are, that respondent and the deceased went together to the forest, where the dead body was found, in an unfrequented place in the forest, with no one present except the parties to the affray; that the deceased was first wounded by a shot from respondent's shot gun, in the back of the head, neck and right shoulder; then by a bullet from his revolver, entering the brain, near the right ear; then three shots from the same revolver, after death, entering the chest and vital organs.

Did this tend to show, or to countenance the conjecture, that the intention to kill, "was formed only a moment before" the act of killing? If not, then it was the duty of the court, not to charge as requested. And we think it did not within any legitimate limits, to be assigned to the period of time indicated by the word, "moment," as used in the request. Of course, unless that expression indicated a period of time, that, of itself, would distinguish between murder in the first and second degrees, the request could not be complied with in the terms, in which it was made; and the court would have either to flatly disregard it, on the one hand, or explain to the jury, on the other, the relation of the state of mind to the fatal act, that would make the act of the one degree, or of the other. That expression, "formed only a moment before," would not mark and express the distinction in question. So the court proceeded to state, and explain to the jury the law, as applicable to the case in hand, as represented by the evidence, constituting the matter to be considered and decided by the jury.

In *State* v. *Tatro*, 50 Vt. 483, the subject of the statute, as to murder in the different degrees, was examined and considered; and as a result, it was announced, that "the statute has in no degree altered the common law definition of murder. The killing a human being by poison, or lying in wait, or purposely using a deadly weapon to that end, is murder in the first degree; and the purpose and intent must be determined by the circumstances that

surround each case." The charge was a practical application of this doctrine to the case in hand. That application we regard as legitimate and fully warranted by the soundest reason, and by authority. A case, cited in 2 Whart. Crim. Law, s. 1085, holds, that what premeditation meant, "is, that the design must be formed before the act, by which the effect is produced, is performed, though such premeditation may be, but for a moment." In an early case, in Pennsylvania, 4 Dal. 145, upon full consideration, the true view of this subject was ably developed by Ch. J. McKEAN. In the course of that decision it is said, "But let it be supposed that a man, without uttering a word, should strike another on the head with an axe, it must, on every principle, by which we can judge of human actions, be judged a premeditated violence." In *Commonwealth* v. *Daley*, 4 Penn. Law Jour. 156, cited, 2 Whart. s. 1114, it was said, "It is true the act says the killing must be wilful, deliberate and premeditated. But every premeditated act is, of course, a wilful one ; and deliberation and premeditation simply mean that the act was done with reflection, and conceived beforehand. No specific length of time is required for such deliberation. It would be a most difficult task for human wit to furnish any safe standard in this particular. Every case must rest on its own circumstances. The law, reason and common sense unite, in declaring, that an apparently instantaneous act may be accompanied with such circumstances as to leave no doubt of its being the result of premeditation."

The statute names several modes of killing, that would make the killing murder in the first degree ; and then says, "or by any other kind of wilful, deliberate or premeditated killing," etc., not defining any mode or means of doing it. Therefore, where the murder is done, not by the specified mode and means that make it murder in the first degree, it is to be determined, whether the killing was wilful, deliberate or premeditated, by whatever mode or means it was done. If it was premeditated, it would be murder in the first degree. That is to say, if the killing was murder, then if it was done with premeditation, it would be in the first degree. That term, " premeditated," was not meant to require any particular length of time, that such premeditation

should have been going on, prior to the fatal act. But if, in fact, it did precede the act, it gave character to the crime. It was meant to distinguish between an act done with murderous intent, with a purpose of mind to kill, and an act done upon sudden impulse, without meditation, or murderous intent.

We think the subject was properly presented by the charge ; and that the full benefit of the statute in its true intent and meaning was accorded to the respondent. The present occasion does not require further pursuit of the subject. The result is, the respondent takes nothing by his exceptions. They are overruled, and judgment and sentence is to be rendered upon the verdict.