## Court of Appeals.

November, 1901.

## THE PEOPLE v. JOHN SCHMIDT.

(168 N. Y. 568.)

1. MURDER—DELIBERATION AND PREMEDITATION.

Where is it certain that accused killed deceased by a blow from a deadly weapon, and his story of the occurrence is found untrue, the fact that no ill feeling or animosity on the part of defendant toward the deceased was shown, does not rebut the inference of deliberation which may be derived from the occurrence itself and the subsequent conduct of the defendant.

2. SAME—TIME MAY BE VERY BRIEF.

The time for premeditation need not be long. It must be sufficient for some reflection and consideration upon the matter for a choice to kill or not to kill, and for the formation of a definite purpose to kill, and when the time is sufficient for this it matters not how brief it is.

3. TRIAL—CODE CIV. PRO., Sec. 1086.

The excusing of jurors from service on their unsworn statements is an irregularity but not one of which defendant can complain where it is not shown that the action of the court operated to his prejudice.

4. EVIDENCE OF EXPERT.

The testimony of the physician who made the autopsy on the body of deceased that the indentation made in the head large enough to receive an orange could not have been produced by a single blow, held competent as a matter of medical science and skill involving technical knowledge.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of Columbia June 5, 1899, upon a verdict convicting the defendant of murder in the first degree.

The facts, so far as material, are stated in the opinion.

A. Frank B. Chace and Alfred Bruce Chace, for appellant.

Mark Duntz, District Attorney (J. Rider Cady, of counsel), for respondent.

CULLEN, J.    The appellant was indicted for murder in the first degree in having killed William Hilderbrandt at the town of Claverack, in the county of Columbia, on September 12, 1893.    The defendant, a man of some fifty years of age at the time of the crime, was a native of Polish Prussia, coming to this country about the year 1882, and from that time he had worked here as a mason or plasterer and at farm labor.    His knowledge of English was imperfect, and he seems to have been able to understand the language better than he could speak it.    For some years previous to 1891, he had been engaged working on a farm in Columbia county.    In February of that year he married Dora Hilderbrandt, also a German.    She was the mother

of the deceased, William Hilderbrandt, a lad of nineteen or twenty years, who at the time of her marriage was still in Germany, the woman having left her family there when she came to this country in 1891.    From the marriage to the commission of the homicide the defendant and his wife lived during a part of the time in Columbia county, and at other times in New Jersey and Maryland.    In June, 1893, while the defendant was living in Greeneville, New Jersey, he purchased, partly or wholly at his own expense, a ticket from Germany to this country, which was sent to the deceased, and on which the latter obtained his passage to New York.    On his arrival he went to live with his mother and stepfather.    In August, the defendant, with his wife and his stepson, the deceased, returned to Columbia county, moved into a small tenant house in the town of Ghent and again entered upon farm work.    He also did some trapping of small fur-bearing animals.    On the day of the homicide the defendant and the deceased had been working in the fields.    They returned home at the close of the afternoon carrying a woodchuck which had been caught in a trap.    Wesley Stickles, who lived immediately across the road from the defendant, had some conversation with them at the time.    Afterwards, between six and seven o'clock, he saw them leave the house together and walk along the road towards Philmont.    This is the last time Hilderbrandt was seen alive.    The only witness as to what occurred immediately prior to their departure was the defendant's wife.    She testified that when the two men were home at noon the defendant said that he wanted to go to Philmont to get some meat, to which she replied that she didn't want meat, that they had meat enough in the house.    After supper the defendant asked the deceased if he wanted to go to Philmont with him (the defendant).    This seems to have been substantially all the conversation between them.    About nine o'clock that evening the defendant returned home alone.    The testimony of his statements to his wife as to what had become of the deceased was excluded, on the defendant's objection that they were privileged communications.    Their nature can be

readily inferred, however, from what transpired the next day. On that day Schmidt and his wife went to a friend named Steitz, a hotel keeper in the town of Ghent. In the conversation which ensued between the parties, the defendant's wife, the mother of the deceased, told Steitz that her son had been arrested and taken away, and asked him to go with them to Hudson to find out where her boy was. Steitz asked how she knew the deceased had been arrested. To this the defendant replied: "We went to Philmont after some meat and when we went in the butcher shop there was some fellows standing outside; when we came out they followed us up the railroad track and there we had a fight. It was a hard fight, my clothes were all bloody; and then some men came and they arrested Willie and I run away."

Meanwhile, on the afternoon of Wednesday, September 13, the crew on a freight train on the Harlem railroad, while running through the town of Claverack, noticed the body of a man lying on a culvert passing under the roadbed. The culvert was about a mile distant from Philmont. On its return trip the next morning, Thursday, the train was stopped in the vicinity of this culvert and there was found the body of the deceased. Death had occurred many hours before. The skull had been fractured and an indentation made in the head large enough to receive an orange. There had been great loss of blood. At this point the railroad ran on a bank about eighteen feet above the grade or level of the culvert. Grass grew on the slopes to a distance of some four feet from the rails. At the foot of the slope, but between the rails and the mouth of the culvert, there was a low fence. At the edge of the grass towards the rails a large pocket or jackknife was found. The knife was closed. The fence was partially broken down and smaller spots of blood were discovered between this point and that at which the body lay. A few feet from the body was found a hammer, which was identified as belonging to the defendant. The body was removed to Philmont, and an autopsy showed that the wound on the head was the cause of death. The defendant was ar-

rested at his home and was being taken to the county jail in Hudson, when, owing to the negligence of the officers, he succeeded in escaping from custody and was not recaptured till June, 1898, when he came to the residence of one Staats, in Columbia county, for whom he had formerly worked. In conversation he told Staats that he struck the boy with the hammer, but claimed that there had been trouble between them and that he had acted in self-defense. While confined in the county jail awaiting his trial he had conversation with two of his keepers. To one of the keepers he said that he had killed the deceased "because the boy was in bed with his mother, my wife," though on another occasion he told him that he had trouble with the boy when setting the trap, and the boy threatened to hit him with a corn hook; to the other, that he hit the deceased in the head with a hammer, and the reason for it was "the boy was sleeping with his wife and he (the defendant) had to sleep in a corner of the house."

Such are the outlines of the case made by the prosecution. The defence rested on the evidence of the defendant himself. He testified that on the evening of the homicide he went with the deceased, not to purchase meat, but to set traps, taking with him a hammer to drive stakes to which the traps were to be fastened; that while passing along the railroad track he noticed the culvert and thought its mouth would be a good place to set a trap; that the deceased asked to be permitted to set one of the traps; that the defendant gave him one; that the deceased caught his fingers in the trap and asked the defendant to open it so as to get his fingers out; that the defendant opened the trap, the deceased extricated his fingers and thereupon struck the defendant with his fist, saying, "I will give it to you now;" that the defendant staggered and then the deceased said, "I will give you more," put his hand in his pocket and drew out a corn hook or a knife and that thereupon the defendant struck him with the hammer on the head. On further examination he admitted telling his wife that her son had been arrested, but gave a reason for the statement that he

was afraid to tell the truth. He testified that he did not mean to kill the deceased; that after he had struck the deceased he moved him to the side of the culvert and that when he left him there the deceased was still living. He denied making the statement to which the jail keepers had testified. Evidence was given tending to show that the denfendant's character was good with the qualification that he had a quick temper.

On this record the killing of the deceased by the defendant stands admitted. The story told by the defendant in exculpation of his act was discredited by the jury, and justly so. It was on its face grossly improbable. No corn hook was found at the scene of the crime, but a mere pocket knife and that closed. From the location of the pool of blood and the place where the knife was found it is clear that the deceased was struck when he was near the top of the bank, not at the mouth of the culvert where the defendant says the trap was to be set. No trap was found in the vicinity and neither Stickles nor the defendant's wife observed him carrying traps at the time he and the deceased started for Philmont. The subsequent conduct of the defendant was inconsistent with the truth of his story. He concealed the occurrence and told his wife a falsehood to account for her son's absence. After he struck the blow he moved his victim, still living, according to his statement, to the mouth of the culvert, there to die without help or care. The weapon used and the vital part of the body on which the blow was inflicted justified the jury in finding that the defendant intended to take life. The case was conducted with great care by the learned judge who presided at the trial. His charge was eminently fair and impartial. No exception was taken to it nor was any part of it the subject of just objection. Indeed, it may not improperly be said that the defendant's guilt of the crime of murder in one degree or the other is entirely clear. While practically conceding that a conviction of murder in the second degree was warranted, his learned counsel strenuously contends before us that the evidence was not sufficient to make out the case of premeditation and deliberation required

by the statute to constitute murder in the first degree. In support of this position he relies upon the fact that no ill-feeling or animosity on the part of the defendant toward the deceased was shown, and claims that the crime was destitute of motive so far as appears by the record. The defendant paid for the passage of the deceased to this country, and there is no proof of there having been at any time altercations or difficulties between them. The testimony of Stickles and of the wife of the prisoner is very meager as to what passed between him and the deceased prior to their leaving the house to go to Philmont. It must be conceded that there is nothing in that testimony to indicate that the parties were not entirely friendly. On the other hand, there is the testimony of the two keepers of the jail that the defendant stated he killed the deceased because the latter was sleeping with the defendant's wife. The defendant spoke English very imperfectly and was understood with great difficulty. These alleged admissions are, therefore, subject to the criticism that the defendant may have been misunderstood. However, as was said by Judge VANN in People v. Ferraro, 161 N. Y. 365: "The absence of a sufficient motive, which is urged upon us in this connection, while always significant, is not conclusive; . . . where the evidence is circumstantial only, the subject of motive is more important, but when it clearly shows that the fatal act was committed willfully by the defendant, the nature of his motive is unimportant." Were it assumed that the defendant at the time the parties left the house to go to Philmont had not formed the design to take the life of the deceased, this would not preclude a conviction of murder in the first degree. The details of what passed between the prisoner and the deceased on their way, what occurred to excite the anger or arouse the passion of the defendant, what then happened to induce him to commit the crime, if he had not formed the design before, cannot be known from direct evidence except so far as the defendant assumed in his testimony to narrate the occurrence. That he killed the deceased by a blow from a deadly weapon upon a vital spot is certain. That his story

of the occurrence is untrue the jury has found. Therefore, what led up to or induced the crime was necessarily a matter of inference to be derived from the occurrence itself and the subsequent conduct of the defendant. The period which elapsed between leaving the house and the assault was sufficient to afford an opportunity for deliberation. "Under the statute there must be not only an intention to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter for a choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this it matters not how brief it is. The human mind acts with celerity, which it is sometimes impossible to measure, and whether a deliberate and premeditated design to kill was formed must be determined from all the circumstances of the case." People v. Majone, 91 N. Y. 211. It is also said in People v. Conroy, 97 N. Y. 62: "In capital, as well as other cases, it must be held that a person intends that which is the natural and necessary consequence of an act done by him, and unless the act was done under circumstances which preclude the existence of such an intent, the jury had the right to find, from the result produced, an intention to effect it . . . . To infer the existence of deliberation and premeditation does not require the lapse of any special period of time. If a person in undisturbed by sudden and uncontrollable emotions, excited by an unexpected and observable cause, and is in the possession of his usual faculties, it will be presumed that his actions are prompted by reason, and are the result of causes operating upon his mind and deemed sufficient by him to inspire his action."

Therefore, though conflicting inferences might have been drawn from the evidence, we are of opinion that it was sufficient to require the submission of the question of deliberation to the jury. While section 528 of the Code of Criminal Procedure provides, "when the judgment is of death, the Court of Appeals may order a new trial, if it be satisfied that the verdict was

against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below," it is the settled law "that in determining whether a new trial shall be granted under it, it is not the province of this court to review or determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such a case, and that with its decision the court may not interfere unless it reaches the conclusion that justice has not been done." (MARTIN, J., in People v. Decker, 157 N. Y. 186. See People v. Cignarale, 110 N. Y. 23; People v. Kelly, 113 id. 647; People v. Trezza, 125 id. 740; People v. Youngs, 151 id. 210.)

What has been written disposes of the defendant's exceptions to the rulings of the court in denying the motion to dismiss the indictment so far as it charged murder in the first degree, and its refusal to withdraw that charge from the consideration of the jury, as well as its denial of the motion to set aside the verdict rendered by the jury. Of the other exceptions taken on the trial it is necessary to refer to only two. When the court was convened and the jurors responded to the call of their names and before the defendant was placed on trial, a number of the jurors were excused from service. This action was had on their unsworn statements as to the nature of their excuses. This was an irregularity. Section 1086 of the Code of Civil Procedure prescribes that the court shall not excuse a trial juror unless the facts entitling him to be excused are made to appear by the oath of the juror. But it is an irregularity of which the defendant cannot complain. By section 362 of the Code of Criminal Procedure "a challenge to the panel can be founded only on a material departure, to the prejudice of the defendant from the forms prescribed by the Code of Civil Procedure, in respect to the drawing and return of the jury, or on the intentional omission of the sheriff to summon one or more of the jurors drawn." It was not shown that the action of the court in any manner operated to the prejudice of the defendant, and it is difficult to imagine how it could have had that effect. The defendant had

a fair and impartial jury to try the charge against him. The suggestion that had these jurors been sworn they might not have been excused, but have been drawn on the jury and possibly a different verdict rendered, is pure speculation without any foundation of fact. The challenge to the panel was, therefore, properly overruled. The testimony of Dr. Woodruff, the physician who made the autopsy on the body of the deceased, that the injury on the head could not have been produced by a single blow, was competent. (Commonwealth v. Piper, 120 Mass. 185.) The matter was one of medical science and skill involving technical knowledge of anatomy and, therefore, properly the subject of expert evidence.

The judgment appealed from must be affirmed.

PARKER, Ch. J., GRAY, BARTLETT, MARTIN, VANN, and WERNER, JJ., concur.

Judgment affirmed.