Belknap,  ⎫
Dec. 30, 1902. ⎬

STATE v. GREENLEAF.

An objection that the list of witnesses furnished to the respondent in a capital case did not state the place of abode of each is waived unless taken before the trial begins.

A remark of counsel which may be capable of an objectionable construction does not furnish ground for a new trial, if such an understanding is rendered impossible by an immediate instruction of the court.

A medical expert may be permitted to give an opinion as to whether fractures of the skull were probably caused by a fall, and as to the number and comparative force of blows required to produce particular injuries.

Remarks of counsel interjected during the examination of witnesses, and not inconsistent with legal fairness of trial, do not furnish cause for setting aside a verdict.

At common law, as well as under the statute, an unlawful killing with a design to effect death, but unaccompanied with malice, is manslaughter and not murder.

The amendment of the statute defining the crime of manslaughter in the first degree, by inserting the words "with a design to effect death," was not intended to affect the common-law distinction between murder and manslaughter, or the rules of proof required to establish those offences ; and sections 1 and 7, chapter 278, Public Statutes, with their associated sections, merely divide each of those crimes into two degrees, and provide variable punishment therefor.

Malice, as an essential element of the crime of murder, is not an inference of law from the mere act of killing ; but like any other fact in issue, it must be found by the jury upon competent evidence.

To warrant a conviction of murder in the first degree, it is incumbent on the state to prove beyond a reasonable doubt that the homicide was malicious, and also that the crime was deliberate and premeditated, in the natural and ordinary sense of those words, or was committed in perpetrating or attempting to perpetrate one of the collateral felonies specified in the statute.

Homicide in furtherance of a design to commit rape is murder in the first degree, although the rape intended was neither consummated nor begun.

Upon the trial of an indictment for murder, evidence as to the character of the weapon employed, the force and number of the blows inflicted, the location and severity of the wounds, the place of the crime, previous conduct and remarks of the accused indicating preparation, and his subsequent acts and statements inconsistent with innocence, is properly submitted to the jury as bearing upon the questions of malice and deliberation.

For the purpose of disparaging his credibility, one expert witness may be cross-examined with reference to the professional standing of another whom he has contradicted.

A remark of counsel which conveys the impression that the respondent's character was such that all eyes turned to him as the perpetrator of a crime with which he stands charged, and an assertion in argument of a material fact unsupported by any evidence and prejudicial in its tendency, furnish sufficient ground for setting aside a verdict.

INDICTMENT, charging the defendant with the murder of Nancy J. Folsom. The defendant was indicted in Merrimack county. On his motion, the venue was changed to Belknap county, where the trial took place at the November term, 1901, of the superior court, *Wallace*, C. J., and *Pike*, J., presiding. The jury returned a verdict of guilty of murder in the first degree. Judgment was ordered on the verdict, and the defendant filed a bill of exceptions, which was allowed.

After the jury were impaneled and issue was joined, and as counsel was about to make an opening statement, the defendant moved for his discharge, on the ground that he had not been furnished with a list of the state's witnesses and the place of abode of each, twenty-four hours before the trial. A list of the witnesses had been seasonably furnished, but it omitted to state the place of abode of each; and this fact was known to the defendant's counsel when the drawing of the jury began. The motion was denied, and the defendant excepted.

In opening, counsel detailed the facts which the state expected to prove, and said: "We think if we show this array of facts, that Greenleaf, in order to escape the conclusion that he committed this deed, must show you what he did with that pair of overalls, how this human blood became spattered over his clothing, and where he was on the afternoon of the crime." Exception be-

ing taken to the language quoted, counsel expressed a willingness to withdraw any objectionable remark, and stated that he meant to say, that if the facts detailed were proved, there could be only one conclusion from them. The court thereupon stated to the jury that the defendant was not obliged to answer, nor to testify, nor to explain anything, and instructed them to disregard any remark of counsel conveying a contrary impression.

Dr. Beaton, an expert witness called by the state, testified subject to exception that the blow which caused the fracture upon the side of the skull was light in comparison with the other blows inflicted, and that the appearance of the wounds in the soft and bony tissues indicated that the fractures resulted from more than one blow.

Lafayette, a witness for the state, whose abode was set out in the witness list as Haverhill, Mass., was in Laconia when the list was furnished to the defendant. Stetson, a witness for the state, who had been living for eight days at the county farm in Boscawen and whose abode was so set out, testified that his home was in Concord. The testimony of these witnesses was admitted subject to exception. The court found that the list correctly stated their places of abode.

The facts relating to other exceptions taken to rulings of the court and remarks of counsel are stated in the opinion.

The state's evidence tended to prove the following facts:

The Cat Hole road, so called, is a highway running from the Merrimack county buildings in Boscawen to High street in the same town. There are no dwellings on the road. Shortly before three o'clock in the afternoon of October 23, 1901, Mrs. Folsom started from her home, located on High street in Boscawen, to drive with a horse and buggy to North Boscawen, by way of the Cat Hole road. About fifteen minutes past four, she was found lying beside the road in an unconscious condition, her skull having been beaten in by three or more blows with some blunt instrument. She died from these injuries in the evening of the same day. An examination showed that there had been no rape, nor was the underclothing upon the body torn or disarranged. The place of the crime was distant 5,271 feet from the county buildings.

It was Mrs. Folsom's custom to drive over the Cat Hole road at about the same time each day, to meet her daughter, who usually came from Concord by an afternoon train. This was known to the defendant, who was a convict at the county farm. He had frequently been in the vicinity where the crime was committed, was there the day before, and on more than one occasion had spoken to Mrs. Folsom. About ten days before the crime, he

said to a witness that he would like to have sexual intercourse with Mrs. Folsom, and repeated the remark the following day, adding that he "stood pretty well" with her. He told another witness that he had a "chewing match" with Mrs. Folsom, and two or three days before the crime he said to a third witness that he would have sexual intercourse with her, dead or alive. The day of the crime was the first on which Mrs. Folsom had driven over the Cat Hole road alone, when there were no persons in the vicinity, after these remarks were made by the defendant.

About half past two o'clock in the afternoon of October 23, 1901, the defendant was seen to leave the county buildings and go toward the place of the crime. He was not seen again until about half past four o'clock, when he came from that direction behind the cows. Prior to that time he had worn two pairs of particolored prison overalls, the outside pair being the shorter by about two inches. On the morning after the crime, the defendant was locked up and his clothing was taken from him. He then wore a duck jacket, blouse, one pair of overalls, shoes, stockings, shirt, and hat. An examination disclosed stains of human blood on the jacket, blouse, and shoes, and also on a towel which was found in his possession. The overalls taken from him had been worn since October 12, but underneath another pair. The defendant had lost his right arm, and the right-hand pocket of the overalls taken from him showed that it had not been used. When the defendant was ordered to remove his clothing, he trembled violently; and when asked if it was not too cold to go without drawers, he replied that he had worn an extra pair of overalls, but had torn them, and had left them at the bath-room door.

On the following Sunday, a pair of overalls were found hidden in a heap of brush in the vicinity of the pasture from which the defendant drove cows, at a point 1,873 feet from the Cat Hole road and 2,751 feet from the place of the crime. These had a rent in the leg near the crotch, as had also the outside pair worn by the defendant a day or two before the crime. They appeared to have been somewhat soiled by wear, and were spattered with blood. The right-hand pocket had not been used. The overalls taken from the defendant on the morning after the crime measured thirty-one and one half inches in the leg, and had a total length of fifty-two inches; the pair found measured thirty inches in the leg, and had a total length of forty-nine and one half inches.

Footprints made on the day of the crime, by a person wearing shoes like those of the defendant, were found going in both directions over the Cat Hole road, from a point near the place of the crime towards the county buildings. On the morning after the crime, the defendant said that on the day before he went on

the Cat Hole road only as far as a reservoir visible from the county buildings. He afterward stated that he might have been as far as some chestnut trees which were well over a hill toward the scene of the crime.

The stenographer's minutes of the evidence and arguments in full are a part of the record.

*Edwin G. Eastman,* attorney-general, and *David F. Dudley,* solicitor, for the state.

*Nathaniel E. Martin* and *Charles F. Flanders,* for the defendant.

REMICK, J. 1. The exceptions relating to the sufficiency of the witness list and to the time of furnishing the same are overruled, for reasons well expressed in *Lord* v. *State,* 18 N. H. 173, 176.

2. The statement of the solicitor in opening, to which exception has been taken, does not, upon any fair construction, involve a declaration that the respondent was personally bound to become a witness and answer the state's evidence, or stand convicted; but means only that the facts proposed to be shown, unless in some way met in defence, would constitute indubitable proof of guilt. If the language used might, unexplained, be understood in the objectionable sense, such misunderstanding was made impossible by the immediate instruction of the court.

3. The force of the blow on the side of the head in comparison with the other blows, and the number of blows necessary to cause the cuts on the top of the head, in the absence of direct evidence, could only be determined by the appearance of the wounds viewed with a knowledge of the structure of the skull and its capacity for resistance at the points of impact. As the significance of the wounds might not be as apparent to a juror as to one having technical training and professional experience in such matters, we think the evidence of Dr. Beaton was competent. *State* v. *Knight,* 43 Me. 11, 130; *State* v. *Pike,* 65 Me. 111; *Commonwealth* v. *Piper,* 120 Mass. 185; *Colt* v. *People,* 1 Park Cr. Rep. 611, 620; *Gardiner* v. *People,* 6 Park Cr. Rep. 155; *People* v. *Schmidt,* 168 N. Y. 568, 569, 578; *Davis* v. *State,* 38 Md. 15, 37; *State* v. *Clark,* 12 Ired. 151; *State* v. *Morphy,* 33 Ia. 270, 272; *State* v. *Porter,* 34 Ia. 131.

4. The objection to each witness for the government as offered, upon the ground of the insufficiency of the list, like the objection to the list itself, is overruled, and upon the same authority and for the same reasons.

5. It was a vital question in the case whether certain fractures of the top of Mrs. Folsom's skull were caused by blows inflicted

by the respondent, or by contact with a stone in the ground while accidentally falling from her carriage. The state claimed that if the impact had been the result of a fall, as contended by the respondent, it would not have crushed the skull at the top in the way it appeared; that the thickness of the skull at that point would have protected it; and that the fracture would have been at the base of the skull, where it is comparatively thin. In this view, we think it was competent for the state's medical expert to illustrate by means of a candle inside the skull, the relative thickness of its different parts, and to testify, "from my experience and observation of many cases in hospitals, I have learned that when a body falls from a height and strikes on the head, the most usual place of fracture is at the base of the skull." See authorities collected under division 3.

6. The remark of the solicitor after one of his questions had been objected to and ruled out,— "I think the witness has made that sufficiently clear,"— if open to objection at all, "belongs at most to that class of irregularities not so inconsistent with legal fairness as to require the granting of a new trial." *Guertin* v. *Hudson, ante, p.* 505; *Gilman* v. *Laconia, ante, p.* 212.

7. It is found that the abodes of Lafayette and Stetson were stated in the witness list in accordance with the fact. The exceptions based upon the ground that they were not correctly stated are therefore overruled.

8. "At the close of the evidence for the state, the state claiming that the evidence proved murder in the first degree and not any other degree of murder or manslaughter, the defendant moved that he be discharged, upon the ground that there was not sufficient evidence to be submitted to the jury to justify their finding him guilty of murder in the first degree. The court denied the motion, and the defendant excepted."

In this connection, it is contended by the respondent that the amendment of section 7, chapter 282, of the General Laws, by inserting the words "with a design to effect death" (Comm'rs' Rep. P. S., *c.* 277, *s.* 7; P. S., *c.* 278, *s.* 7), as descriptive of one kind of manslaughter in the first degree, has made a higher measure of proof necessary to establish murder, unless distinction between that crime and manslaughter is to be obliterated.

The fallacy of this contention is in the assumption underlying it: that the words "with a design to effect death" necessarily imply murder, and are inconsistent with manslaughter, as those crimes were known at common law. At common law, killing with design might be either murder or manslaughter. Malice was the distinguishing element. Without malice, killing with design was only manslaughter, as killing in passion under provocation.

With malice, killing with design was murder, as killing in obedience to "the dictate of a wicked, depraved, and malignant heart." *State* v. *Pike*, 49 N. H. 399, 404. This court has said: "It is not true that manslaughter is necessarily killing without a design to effect death. Some cases of manslaughter are of this kind. But there are other cases, where, notwithstanding the intention clearly was to destroy life, the offence is reduced to manslaughter, by circumstances of great and sudden provocation, or the like." *State* v. *Butman*, 42 N. H. 490, 492. The authorities "clearly show that the crime of manslaughter may be intentionally committed," and independently of statute. *State* v. *Calligan*, 17 N. H. 253, 255 ; *Rex* v. *Taylor*, 5 Bur. 2793 ; *State* v. *McDonnell*, 32 Vt. 491, 492 ; *Gann* v. *State*, 30 Ga. 67 ; *Hornsby* v. *State*, 94 Ala. 55 ; *Dennison* v. *State*, 13 Ind. 510 ; *Maher* v. *People*, 10 Mich. 212 ; *Nye* v. *People*, 35 Mich. 16 ; *People* v. *Freel*, 48 Cal. 436 ; 4 Bl. Com. 191 ; 1 Whart. Cr. L., *s.* 304 ; 2 Bish. Cr. L. (7th ed.), *s.* 676 ; 21 Am. & Eng. Enc. Law 172.

As the statute stood before the amendment in question, manslaughter "with design," of the character illustrated by the foregoing cases, if provided for at all, was included in the classification of manslaughter in the second degree, and punished less severely than manslaughter without design, under circumstances otherwise the same. To correct this absurdity, not to change the common-law distinction between murder and manslaughter or the rules of proof relating to the same, was the evident and only purpose of the amendment. It may be said now as truly as before the amendment, that sections 1 and 7, chapter 278, of the Public Statutes, and associated sections, make nothing murder which was not murder at common law, and nothing manslaughter which was not manslaughter at common law, but merely divide each into two degrees, and provide punishment variable according to the degree. *State* v. *Pike*, 49 N. H. 399, 403 ; *State* v. *Almy*, 67 N. H. 274, 275 ; *State* v. *Carr*, 53 Vt. 37, 45 ; *State* v. *Dowd*, 19 Conn. 388, 392 ; *Nye* v. *People*, 35 Mich. 16, 17, 19 ; 1 Whart. Cr. L., *s.* 377.

In dividing murder into degrees our legislature has provided : " All murder committed by poison, starving, torture, or other deliberate and premeditated killing, or committed in perpetrating or attempting to perpetrate arson, rape, robbery, or burglary, is murder of the first degree ; and all murder not of the first degree is of the second degree." P. S., *c.* 278, *s.* 1. The distinction between the degrees thus created lies not in the presence or absence of malice, as in case of murder and manslaughter, for malice is indispensable to both degrees ; but it depends upon whether the killing is with deliberation and premeditation or otherwise, excepting mur-

der accomplished in perpetrating or attempting to perpetrate arson, rape, or burglary, and that is made murder in the first degree regardless of intent to kill, because of the peculiarly vicious character of the collateral offences.

It follows, that to warrant conviction of murder in the first degree, the state must show beyond a reasonable doubt not only killing with malice, but must go further and show that the killing was deliberate and premeditated, unless done in perpetrating or attempting to perpetrate one of the collateral felonies named in the statute. *State* v. *Pike*, 49 N. H. 399; *Buel* v. *People*, 78 N. Y. 492, 499; *People* v. *Schmidt*, 168 N. Y. 568, 574, 575, 576; *Nye* v. *People*, 35 Mich. 16, 17, 19; 21 Am. & Eng. Enc. Law 145, 167.

Malice is not an inference of law from the mere act of killing; but like any other fact in issue, it must be found by the jury upon competent evidence. See Review of Trial of Prof. Webster, by Joel Parker, 72 North Amer. Rev. 178; 2 Cool. Black. (3d ed.) 395, note; Whart. Cr. Ev. (9th ed.), *s.* 738; 2 Bish. Cr. L. (7th ed.), *s.* 673; 21 Am. & Eng. Enc. Law 139. In this view, the argument of the respondent's counsel, based upon the doctrine of implied malice, would seem to be irrelevant.

As to the element of deliberation and premeditation, while it need not be shown that the killing was deliberated and premeditated for any particular length of time (*State* v. *Carr*, 53 Vt. 37, 46, 47; Walk. Am. Law 538, 539; 2 Bish. New Cr. L., *s.* 728; 1 Whart. Cr. L., *s.* 380), yet we think it is quite evident from the kinds of murder which the statute specifically designates as deliberate and premeditated,—namely, murder by poison, starving, and torture,—followed as those terms are by the words " or other deliberate and premeditated killing," that the legislature used the words " deliberate and premeditated " in no narrow or technical, but in their natural and ordinary sense, and intending to exclude from the operation of the death penalty murder committed on the impulse of the moment, without actual deliberation and premeditation, unless committed in perpetrating arson, rape, robbery, and burglary. They were " meant to distinguish between an act done with murderous intent, with a purpose of mind to kill, and an act done upon sudden impulse, without meditation or murderous intent." *State* v. *Carr*, 53 Vt. 37, 47. " It was rightly considered that what is done against life deliberately, indicates a much more depraved character and purpose than what is done hastily or without contrivance. But it is a perversion of terms to apply the term ' deliberate ' to any act which is done on a sudden impulse." *Nye* v. *People*, 35 Mich. 16, 17, 19. " There must be not only an intention to kill, but there must also be a deliberate and premed-

itated design to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is. The human mind acts with celerity which it is sometimes impossible to measure; and whether a deliberate and premeditated design to kill was formed, must be determined from all the circumstances of the case." *People* v. *Majone*, 91 N. Y. 568, 576; *People* v. *Schmidt*, 168 N. Y. 568. " The questions for the jury are : Had the slayer space and opportunity for reflection? Did he think over what he was about to do? Did he coolly form a settled purpose? Was his mind sedately and considerately made up to take life? If these questions be answered in the affirmative, the verdict must be murder in the first degree. If not, and yet the killing was done purposely and maliciously, it must be murder in the second degree," unless committed in perpetrating or attempting to perpetrate arson, rape, robbery, or burglary. Walk. Am. Law (7th ed.) 538, 539.

The contention, that even if the respondent murdered Mrs. Folsom in attempting to perpetrate rape it was not an attempt within the meaning of the statute, because not far enough advanced toward consummation, is contrary to reason and authority. *Lewis* v. *State*, 35 Ala. 380, 388; *Taylor* v. *State*, 50 Ga. 79; 1 Bish. Cr. L. (7th ed.), s. 733. That the respondent actually attempted rape, and killed Mrs. Folsom as a means or outcome of such attempt, were, however, facts which the state was bound to establish beyond a reasonable doubt to warrant conviction of murder in the first degree upon that ground. *Kelly* v. *Commonwealth*, 1 Grant Cas. 484; *Pliemling* v. *State*, 46 Wis. 516.

The state was also bound to establish beyond a reasonable doubt the malice and deliberation essential to convict in the first degree upon the other ground. In short, " no man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them, by whomsoever adduced, is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." *Davis* v. *United States*, 160 U. S. 469.

But while malice and deliberation when essential to murder in the first degree, like the attempt to perpetrate rape when that is relied upon to bring killing within the capital classification, must be established beyond a reasonable doubt, direct evidence is not necessary for this purpose. The character of the weapon employed, the force and number of blows inflicted, the location and severity of the wounds, the place of the crime, previous remarks

and conduct indicating preparation, subsequent acts and statements, and every circumstance having a legitimate bearing upon the subject, may be considered by the jury. *People* v. *Schmidt,* 168 N. Y. 568 ; Whart. Cr. Ev. (9th ed.), *s.* 738 ; 1 Whart. Cr. L., *s.* 381 ; 21 Am. & Eng. Enc. Law 161.

The evidence in the present case is too voluminous to reproduce or satisfactorily epitomize. Suffice it to say, we have examined it in its length and breadth, and applied to it the legal tests already indicated. While the evidence is circumstantial, conflicting, and unsatisfactory, and, unaided by the appearance of the witnesses and other legitimate advantages of presence at the trial and scene of the alleged killing, not such as to remove doubt from the judicial mind, yet the court are of the opinion that it was sufficient to warrant its submission to the jury upon the material questions: (1) whether the respondent killed Mrs. Folsom; (2) whether he did it with malice, deliberation, and premeditation; (3) whether he did it in attempting to perpetrate rape. The motion to discharge was therefore properly denied.

9. The remark of the attorney-general after the defendant's witness Lawson had testified, to the effect that his testimony did not contradict the testimony of the state's witness Hamilton, as claimed by the defence, but confirmed it, and the remark of the attorney-general in connection with the cross-examination of the defendant's witness Angell,—"I don't know about this stump speech business; I object to his making a stump speech here to display his knowledge,"—stand like the remark of the solicitor covered by exception 6 ; and if open to objection at all, belong "to that class of irregularities not so inconsistent with legal fairness as to require the granting of a new trial." *Guertin* v. *Hudson, ante, p.* 505.

10. Professor Wood and Professor Angell having testified for the state and defence respectively, drawing opposite conclusions, we think it was competent for the state in the cross-examination of Angell to ask him if he had known of Professor Wood some time, and if the latter was regarded as an eminent authority in these matters,—not for the purpose of showing as affirmative evidence the ability and standing of Professor Wood, but merely by way of cross-examination, for the purpose of discrediting the witness and weakening his testimony, before the jury upon the points at issue between him and Professor Wood.

11. The remark of the state's counsel in the course of his closing argument to the jury,— " Why, it seems that for some reason or other, when this affair in regard to Mrs. Folsom came out, everybody went down there to see about Greenleaf,"— was calculated to convey to the jury the idea that Greenleaf was such a character

that all eyes immediately turned toward him as the perpetrator of the crime. That it was improper and prejudicial does not admit of doubt. When objected to, it was not retracted, but persisted in. The court did not order it stricken out, nor is it found that it did not prejudice the jury. Verdicts in civil cases without number have been set aside because of remarks of counsel no more prejudicial. *Hilliard* v. *Beattie*, 59 N. H. 462 ; *Perkins* v. *Burley*, 64 N. H. 524 ; *Jordan* v. *Wallace*, 67 N. H. 175 ; *Heald* v. *Railroad*, 68 N. H. 49 ; *Greenfield* v. *Kennett*, 69 N. H. 419.

*Greenfield* v. *Kennett, supra*, was an action in assumpsit for lumber sold. The plaintiff's counsel in his closing argument said that he " should be willing to try this case before a jury composed of parties with whom he [the defendant] had dealt." The defendant objecting, the plaintiff withdrew the remark and asked the jury not to consider it. The court at the time, and again in the charge, instructed the jury to disregard it. Nevertheless, the verdict was set aside. Manifestly, the remark in that case was no more prejudicial than the remark now under consideration. Furthermore, in that case counsel who made the remark withdrew it and asked the jury not to consider it, and the court repeatedly instructed the jury not to regard it; while in the present case the remark was persisted in after objection, and it does not appear that the jury were instructed to disregard it. *Greenfield* v. *Kennett* presents no extreme illustration of the principle. In the mass of authorities upon this subject in this jurisdiction, well collected in *Story* v. *Railroad*, 70 N. H. 364, may be found other cases quite as much in point.

If the opinion anywhere exists that the rule established in this jurisdiction is too strict for the practical administration of justice, all must nevertheless agree, that such being the rule in the most petty civil case, it would be absurdly inconsistent, and bring both the rule and the court into contempt, to suspend or juggle with it in a case involving human life, however dastardly the alleged crime, disreputable the accused, or clamorous the public. " A highly-wrought condition of the public mind, the popular horror and indignation that arise upon the commission of a dreadful crime, are not favorable to the calm and dispassionate application of a just and humane law. They do not always leave the vision clear. But popular clamor, however loud, cannot be permitted to invade this place without imperiling the most sacred rights of the innocent as well as the guilty. The rule which we apply in the trial of a wretch who has ravished and killed an innocent girl, and then, with the incarnate spirit of a fiend, torn and cut and mutilated her body in a way that causes the blood to curdle and the heart to rise in almost uncontrollable rage, is the same rule which

we must apply to the trial of the innocent victim of a wicked and audacious conspiracy, or of one who, without fault, has become entangled in a mesh of circumstances which threaten an innocent life." *Ladd,* J., in *State* v. *Lapage,* 57 N. H. 245, 301.

12. The remark of counsel for the prosecution in closing argument,—"This statement was taken right off the very next day after the affair happened,"—referring to a portion of the testimony of the government's witness Graney, was manifestly intended to persuade the jury that his testimony was true, because he had stated the same thing in the same way immediately after the alleged crime. There was no evidence that Graney had ever given a statement prior to testifying on the stand, and there was nothing in the record from which such an inference could be legitimately drawn. As the assertion was wholly unsupported by evidence and calculated to prejudice the respondent by securing for vital statements of the witness a higher degree of credit than otherwise, and the evil not having been remedied as the law requires (*Story* v. *Railroad,* 70 N. H. 364, 376), but aggravated by persistence, it stands upon the record as reversible error, under the rulings of this court fully collected in *Story* v. *Railroad,* 70 N. H. 364, 372, 373, 374, 375, 376, 386, 387. The point that the exception to this statement was too general, if ever entitled to consideration in a capital case where the exception involves a question of fair trial, has little weight in the present instance, the purpose and application of the exception being obvious and unmistakable from the connection in which it was made.

13. In view of the conclusions reached respecting the argument of the state's counsel in the particulars covered by the two preceding heads, we will not consider the argument in other particulars claimed by the defence to be exceptionable.

14. In the charge, the court, after instructing the jury in regard to murder in the first degree, said : "There is no contention on the part of the state or the defendant that there is any other offence than that of murder in the first degree. You are therefore required to either acquit the defendant or find him guilty of murder in the first degree." To this instruction the defendant's counsel assented, and during his closing argument he said: "This is an indictment for murder in the first degree. The state charges George H. Greenleaf with the premeditated murder of Mrs. Folsom. They charge it in the first degree, and in no other degree. There is no evidence introduced here by the state or by any one else that changes the issue in that respect." Some three months after the trial the defendant asked for an exception to the part of the charge above quoted; his request was not granted. His position now is, that fundamental error was committed, be-

cause the question of the degree of the crime, if murder, was not left to the jury, but was determined by the court; and he calls attention to section 2, chapter 278, of the Public Statutes, which provides: "If the jury shall find a person guilty of murder, they shall, by their verdict, find also whether it is of the first or second degree."

If it is assumed, without deciding the point, that the respondent is entitled to the benefit of his exception taken long after the trial, it is not necessary to determine at this time the questions raised thereby. Whether the charge of the court was erroneous, as now claimed by the respondent, and, if it was, whether he did not effectually waive his right to take advantage of it by assenting thereto at the trial, or whether it was competent for him to bind himself by such assent, are questions of so much difficulty that it is not deemed advisable to express an opinion upon them. As there must be a new trial for other reasons, it would not be useful to determine these questions, in anticipation that they will again be presented upon the next trial.

*Exceptions sustained : verdict set aside.*

All concurred.