Grafton
No. 82-077

## The State of New Hampshire

v.

## Stephen J. Sadvari

June 15, 1983

*Gregory H. Smith*, attorney general (*Martha V. Gordon*, assistant attorney general, on the brief and orally), for the State.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendant.

DOUGLAS, J.   The defendant appeals from a jury verdict finding him guilty of first-degree murder, RSA 630:1-a, and sane, RSA 628:2. He claims that the evidence of premeditation and deliberation was insufficient to support the jury's verdict, and that the Trial Court (*Johnson*, J.) gave an erroneous instruction on insanity. We affirm the defendant's conviction.

Evidence at trial tended to establish the following facts: In the summer of 1980, the defendant, Stephen Sadvari, and his girlfriend, Cathy Clark, moved from Pennsylvania to New Hampshire. Sadvari obtained a job at the South Wentworth farm of Robert Duncan, who resided there with his girlfriend, Patricia Keefe, and their two-and-one-half-year-old son, Jason. In January 1981, Cathy Clark left the defendant, resulting in his becoming depressed and bitter.

On February 25, 1981, while Duncan was away on business, Keefe hosted a party which the defendant attended. At the party, the defendant became extremely intoxicated as a result of taking several drugs, including cocaine and PCP. While he was intoxicated, he expressed resentment toward Duncan and stated that he needed money. He also made sexual advances toward Keefe, which she rejected as she had in the past.

The following morning, one of the guests at the party, who had spent the night at the Duncan residence, observed the defendant drink a glass of clear liquid. By mid-morning, all the guests from the previous night's party had departed, leaving Keefe, her son, and the defendant alone at the farm. The defendant then took more PCP as well as some caffeine pills.

Sometime during that afternoon, the defendant killed Keefe. He began his assault on the victim either in the kitchen or the living room; she was stabbed several times in the back. At some point during the initial assault, Keefe's son, Jason, attempted to hit the defendant with a fireplace poker. The defendant broke off his attack upon Keefe long enough to lock Jason in the bathroom. When the defendant returned to the living room, Keefe was trying to make a telephone call. He took the telephone away from her, hung up the receiver, and renewed his attack upon her. There was evidence of a

violent struggle throughout the entire downstairs area of the Duncan residence.

After the incident, the defendant fled to Pennsylvania, where he made certain statements about the crime to various individuals. These statements were admitted at trial. The defendant was arrested in Pennsylvania and returned to New Hampshire. He was indicted for first-degree murder and theft, and although he was convicted of both offenses, he has not appealed the theft conviction.

The defendant indicated that he would plead the defense of insanity based upon drug intoxication, and he received a bifurcated trial in which the defendant's guilt of first-degree murder and theft and his sanity were considered separately. At trial, three psychiatrists testified as to the defendant's state of mind at the time of the murder. Two of the psychiatrists expressed their opinions that the defendant was not suffering from PCP psychosis when the murder occurred, while the third psychiatrist testified that he believed the defendant was suffering from PCP psychosis.

The defendant was found guilty of first-degree murder and theft. After a hearing on the sanity issue, the jury retired to consider whether the defendant was insane when he committed the offenses. During this phase of the deliberations, the jury sent a written question to the trial judge asking whether it must find that the defendant was insane if it found that he was mentally ill due to voluntary intoxication. The trial judge instructed the jury as follows:

> "Neither delusion, nor knowledge of right or wrong, nor design or cunning in planning and executing the crimes and escaping or avoiding detection, nor the ability to recognize acquaintances, or to labor, or transact business, or manage affairs, is as a matter of law, a test of mental disease; but *all symptoms and all tests of mental disease are purely matters of fact for you the jury to determine.*
>
> It is only when the defendant claims that his condition of chronic drug abuse constitutes a mental disease or insanity *which renders him incapable of exercising his volition* and thus constitutes a complete defense to a criminal act that he will be excused under the provisions of RSA 628:2 . . . .
>
> *Temporary insanity resulting from voluntary intoxication is not a complete defense* under the provisions of RSA 628:2 . . . ."

(Emphasis added.) The defendant objected and excepted to this answer. The jury then determined that the defendant was sane at the time of the offenses.

On appeal, the defendant contends that there was insufficient evidence to support a finding beyond a reasonable doubt that he acted purposely in causing the death of Patricia Keefe, as defined by RSA 630:1-a, II. In determining the sufficiency of the evidence to support the jury's verdict, we must consider the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Glidden*, 122 N.H. 41, 49, 441 A.2d 728, 733 (1982); *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

RSA 630:1-a, II, defines "purposely" for purposes of the first-degree murder statute as meaning that the defendant's conscious objective was the death of another, and that his acts in furtherance of that object were deliberate and premeditated. In *State v. Greenleaf*, 71 N.H. 606, 614–15, 54 A. 38, 43 (1902), this court identified specific factors which, although circumstantial, were evidence of a defendant's deliberation and premeditation for purposes of first-degree murder:

> "The character of the weapon employed, the force and number of blows inflicted, the location and severity of the wounds, the place of the crime, previous remarks and conduct indicating preparation, subsequent acts and statements, and every circumstance having a legitimate bearing upon the subject, may be considered by the jury."

In this case, a review of the record establishes that there was sufficient evidence from which a rational trier of fact could have concluded that the defendant acted with the requisite deliberation and premeditation. There was evidence that the defendant used at least two deadly weapons in the course of his assault on Keefe. A pathologist testified that all four of the lethal wounds were delivered with considerable force. He also stated that the defendant inflicted twenty-four wounds, that the majority were in the parts of the victim's body where vital organs are generally known to lie, and that the wounds were directed, not random or meaningless. There was also evidence that the assault on the victim lasted for as long as one or two hours. There were intervals of time between the first confrontation and the initial stabbing, and between the subsequent assaults and final slitting of the victim's throat. The defendant made a statement while in Pennsylvania that he practically had to cut off Keefe's head in order to kill her.

A rational jury could have concluded beyond a reasonable doubt that the defendant killed Keefe with premeditation and deliberation after considering the following factors: the signs of a strug-

gle throughout the downstairs area of the house, the length of time during' which the repeated assaults on the victim occurred, the defendant's own statements about the manner in which he "finished her off," the repetition and force of the blows and stabs, the concentration of wounds around vital areas, and the choice of weapons utilized. We therefore hold that the evidence was sufficient for the jury to find that the defendant acted purposely in killing Patricia Keefe.

■ We next address the defendant's contention that the trial court improperly instructed the jury with respect to the defense of temporary insanity due to voluntary intoxication. The standard of our review of a trial judge's instruction to the jury is well settled: We must determine whether the disputed jury instruction, in the context of the instructions as a whole, fairly covers the issue and law of the case. *State v. Bird,* 122 N.H. 10, 15, 440 A.2d 441, 443 (1982).

In the instant case, the trial judge instructed the jury that, in this State, there is no specific test or criterion for determining the issue of sanity, but that it is a question of fact for the jury to decide from all of the evidence adduced during the entire trial. He further stated that the jury was to use any evidence introduced during the trial to resolve the factual question of whether the defendant in this case had a mental disease or defect at the time of the commission of the offense, and whether the crimes were the product of that mental disease or defect. *See State v. Plummer,* 117 N.H. 320, 327, 374 A.2d 431, 435 (1977).

Finally, the trial judge instructed the jury that, unlike the guilt-determination stage of the trial, where the State has the burden of proving every element of the offense charged beyond a reasonable doubt, in the sanity stage of the trial the burden shifts to the defendant. He explained, however, that to establish his defense the defendant must only show that it was more likely than not that he was insane at the time of the offense. *See Novosel v. Helgemoe,* 118 N.H. 115, 127, 384 A.2d 124, 131 (1978). The defendant does not challenge this general instruction to the jury, nor could he.

■ The defendant contends, however, that the trial court committed reversible error in the above-quoted response to a written question from the jury. The defendant argues that, by including the phrase "which renders him incapable of exercising his volition" in the second paragraph, the trial judge created a new legal test for insanity. We disagree. When the instructions are read as a whole, it is clear that the trial judge properly instructed the jury that the issue of insanity is one of fact for its determination and that there is no specific test or criterion to be applied to the facts.

The inclusion of the last two paragraphs quoted above in response to the jury's question was an effort by the trial judge to explain the significant legal distinction between voluntary and involuntary intoxication as a defense to criminal culpability. *See Commonwealth v. McGrath*, 358 Mass. 314, 320, 264 N.E.2d 667, 671 (1970). The language "incapable of exercising his volition" explained to the jury that if it determined that the defendant's actions were the product of a mental disease caused by chronic drug abuse, the legal effect would be that he would be excused from criminal responsibility. This was a correct interpretation of our holding in *State v. Plummer*, 117 N.H. at 328, 374 A.2d at 436.

Although the issue of alcohol- or drug-induced insanity was presented as an evidentiary question in *Plummer*, the trial judge in this case properly recognized that the underlying premise there was that a defendant could be found not guilty by reason of insanity only if his actions were the result of a mental disease in the form of chronic alcoholism or drug abuse, *i.e.*, he was rendered incapable of exercising his volition. *See Novosel v. Helgemoe*, 118 N.H. at 124, 384 A.2d at 129 (cognitive disability causing defendant to believe "that he was squeezing lemons rather than someone's neck" would exonerate him from criminal liability under Criminal Code).

After reviewing the court's instructions in their entirety, we conclude that the trial judge accurately stated the law with regard to insanity. We therefore reject the defendant's claim that the trial court created a new legal test for insanity and thus infringed upon the defendant's right to have the jury determine his sanity at the time the offenses were committed.

*Affirmed.*

BOIS, J., did not sit; the others concurred.