Strafford
No. 83-229

### THE STATE OF NEW HAMPSHIRE

v.

### JAMES CROSMAN

October 4, 1984

*Gregory H. Smith*, attorney general (*Michael A. Pignatelli*, assistant attorney general, on the brief), by brief for the State.

*Joanne S. Green*, assistant appellate defender, of Concord, by brief for the defendant.

SOUTER, J. The defendant was convicted of robbery under RSA 636:1, III(b). The Superior Court (*Dunn*, J.) overruled his objection to certain testimony and denied his motion to dismiss for insufficiency of the evidence. The court likewise denied his motion to set aside the subsequent verdict of guilty. We affirm.

Witnesses reported a robbery of the Brooks Discount Pharmacy in Dover at about 8:00 p.m. on April 1, 1982. They described the robber as about five feet six to five feet ten inches tall, wearing a blue windbreaker, gray sweatpants, and a ski mask, and carrying a metallic object that appeared to be a gun. They said he left with the bills from the cash register and one of the store's paper bags.

There was evidence that about 7:15 on the same evening the defendant left his family's house in Dover wearing blue jeans and an orange down jacket. Witnesses testified that soon after eight o'clock the defendant arrived at the apartment of acquaintances at 90 Stark Avenue, not far from the store that was robbed. He was flushed, sweaty and out of breath, and said he had just run five miles. He was dressed in blue jeans, an undershirt and a tee shirt and brown work shoes. The defendant showed a small stack of bills when he offered to pay for a beer he wished to drink. After unsuccessfully attempting to get a ride in return for cocaine, he left Dover later in the evening and went to a party in Newmarket, where he tried to sell cocaine. He met Melissa Haynes there, and between three and four o'clock in the morning of April 2 he left with her and several others to drive to Maine.

While the defendant had been thus occupied, the police had been to his house in hopes of talking to him about the robbery. They had talked with the defendant's mother there, and had told her they wished to talk with her son about a "disturbance" in Dover that evening. They had indicated their belief that the defendant was in some difficulties with Massachusetts authorities in connection with an armed robbery in that State.

On the way to Maine with his companions, the defendant stopped at his house to get beer. His mother testified that she saw and talked with him then. She said that he was dressed as he had been when he left home. She testified that she told him about the visit from the police and accurately described what the police had said. When the defendant rejoined his companions to go to Maine, he said that the

police had been to his house to question him about an armed robbery.

Later in the day of April 2, the defendant and his associates drove back to Dover. The defendant returned to 90 Stark Avenue, where witnesses saw him looking in the bushes, only to stop doing so when he noticed that he was being observed. The defendant and others then drove to Burlington, Vermont and back. On their return the police questioned the defendant and indicated that he was a suspect in the robbery case. Later that evening the defendant met one of the residents of 90 Stark Avenue. He told her that the police suspected that he had committed a robbery near the house the evening before and that evidence did point to him. He asked her to tell the police he had come to 90 Stark Avenue about seven o'clock and not to say that he had been running.

Four days later, the police arrested the defendant. Thereafter he asked Miss Haynes not to tell the police that he had gone to 90 Stark Avenue after returning from Maine on April 2 and to tell them that she did not believe the defendant had had much money that day.

In the meantime, the police had examined the garbage deposited by the residents of 90 Stark Avenue on April 1. In it they found a bag similar to the one the robber had taken from the Brooks Pharmacy. Evidence indicated that three other stores nearby used a different type of bag.

Turning from these facts to the legal issues in the case, the defendant's first assignment of error is the trial court's ruling allowing the State to ask the defendant's mother the following question, eliciting the following reply:

> "Q. What was the incident in which Captain Rowe used the words robbery or armed robbery?
>
> A. It was an incident in Massachusetts."

Later testimony by the mother confirmed that answer and indicated that the defendant "was aware of that incident in Massachusetts."

The defendant's concern over the possibility of such testimony began before trial with a motion *in limine*. The court granted it by ordering the State "not to mention" through its witnesses any information about the "Massachusetts robbery for which the defendant was arrested on July 30, 1981." The defendant contends that the testimony quoted violated that order and injected harmful prejudice requiring a new trial. The State argues that the trial judge correctly held that despite the ruling *in limine*, the defendant had "opened the door" to the questions and answers in issue here.

In questioning both the mother and the police officer who had spoken with her, the State observed the ruling *in limine* with

extreme caution and sought no testimony about the officer's reference to the charge of armed robbery in Massachusetts. Neither the mother nor the officer testified that the officer had mentioned a robbery when he spoke to the mother. Each testified that the officer had mentioned a disturbance in Dover. The mother testified that she had described the officer's inquiry accurately to the defendant.

The State then elicited testimony from Miss Haynes, that when the defendant had returned from his house to the car to go to Maine he had said that he had learned that the police wished to question him "in an armed robbery case." The evidence thus indicated that the defendant would not have known that the disturbance had been a robbery unless he had committed it. Further testimony, that no news of a robbery had come over the car radio, confirmed that conclusion.

At that point the defense wished to counter the foregoing evidence by proving that the mother would have referred to an "armed robbery" in accurately relaying to the defendant what the officer had said. The transcript indicates that defense counsel was acutely aware of what would happen next, when the State would seek to elicit further testimony that an accurate rendition of the officer's remark about armed robbery would have referred to a Massachusetts armed robbery, and would not have led the defendant to identify that robbery with the disturbance that the officer wished to talk about.

Following extensive colloquies on the consequences of such testimony, the defense presented the mother's testimony that the officer had referred to an armed robbery. The judge then ruled that the defense had "opened up the door to the question of a robbery in Massachusetts" and that he would allow the State to question the mother about it. The testimony quoted above was the result.

In considering the court's ruling we begin by agreeing that a reference to an association between the defendant and an armed robbery unrelated to the charge in question would have been prejudicial and of no apparent probative value when standing alone. *See* *State v. LaBranche*, 118 N.H. 176, 395 A.2d 108 (1978). The original ruling *in limine* to exclude any such references was clearly correct.

Did the defendant's evidence render this ruling inapposite, however, and open the door to the reference to the Massachusetts robbery? "Opening the door" is a conclusory term, and its use is expanding. It applies when one party introduces evidence that provides a justification beyond mere relevance for an opponent's introduction of otherwise inadmissible evidence. In an older, stricter sense "opening the door" was usually identified with the doctrine of curative admissibility, under which the introduction of inadmissible

evidence by one party may entitle the opposing party to the opportunity to do likewise in denial or explanation. C. MCCORMICK, HANDBOOK ON THE LAW OF EVIDENCE, § 57 (2nd ed. 1972). In practice today, the same term is often used more broadly to describe situations in which a misleading advantage may be countered with previously suppressed or otherwise inadmissible evidence. *See, e.g., State v. Brown*, 125 N.H. 346, 480 A.2d 901 (1984); *State v. Butler*, 117 N.H. 888, 379 A.2d 872 (1977); *Harris v. New York*, 401 U.S. 222 (1971).

 The rule that more obviously applies to this case, however, is not usually grouped under the open door. It is the rule of verbal completeness. Under this rule, a party "has the right to introduce the remainder of the writing, statement, correspondence, former testimony, or conversation so far as it relates to the same subject matter and hence tends to explain or shed light on the meaning of the part already received." MCCORMICK, *supra* § 56, at 131; *see Wilson v. Bank*, 95 N.H. 113, 58 A.2d 745 (1948).

The testimony elicited by the defense was misleading if left to stand alone. It suggested that the officer had said that an armed robbery had occurred, and that he wished to question the defendant about it. No one claims that the officer had said that or that the mother had so indicated to the defendant. Consequently, the State sought to correct the false impression, just as the defense had sought to correct the earlier false impression created by the witnesses' omission of any mention of armed robbery. Each side sought to provide more complete evidence, and thus invoked the rule of verbal completeness.

 The defendant concedes that this is the rule, and on this appeal he raises no objection to the mother's testimony elicited by the State, that the officer never used "the words armed robbery in reference to the Brooks" Pharmacy robbery, but rather used those words "as to an entirely different incident." Nonetheless, the defendant claims that the further reference to the armed robbery as supposedly or actually having occurred in Massachusetts was the error. The defendant cites the limitation on the rule of verbal completeness, that it is "subject to the qualification that where the remainder is incompetent . . . because of its prejudicial character then the trial judge should exclude if he finds that the danger of prejudice outweighs the explanatory value." MCCORMICK, *supra* § 56. at 131; *see Wilson v. Bank supra.*

The defendant's argument thus turns on whether the testimony became unduly prejudicial by indicating that the armed robbery in question was a Massachusetts armed robbery. The answer is clearly

no. Massachusetts armed robberies are not different in character from local ones. The fact of geography did not push the explanation beyond the limit of what the rule of verbal completeness concededly allowed.

■ The defendant's second claim of error is that the circumstantial evidence was legally insufficient to prove his guilt. In evaluating his claim we must determine whether the circumstantial evidence and all reasonable inferences from it viewed in the light most favorable to the State excluded all rational conclusions except guilt. *State v. Meloon*, 124 N.H. 257, 469 A.2d 1316 (1983).

■ We begin our inquiry with an examination of the exculpatory evidence. No witness described the robber as over five feet ten, while the defendant is six feet tall. The description of the robber's clothes did not match the description of the clothes on the defendant when he left home or when he arrived at 90 Stark Avenue. A jury could rationally ascribe little weight to these discrepancies, however. There was evidence from which the jury could have found that the defendant had had time to change or discard clothing, and it would have been reasonable to limit the significance of eyewitness testimony about a few inches in height.

The defendant also claims that the evidence of his attempted drug dealing was exculpatory in relation to the robbery charge, for it could explain his fear of involvement with the police. Unfortunately for this argument, the defendant did not ask anyone to lie about his attempts to deal in cocaine. And his statement to his companions on the trip to Maine, about the reason for the police's desire to question him, points to concern over guilt as a robber, not as a drug dealer. Thus, the tendency of the evidence of drug dealing is entitled to little or no weight in countering the inculpatory evidence to which we now turn.

Evidence tending to support the verdict placed the defendant near to the scene at the relevant time. He arrived at 90 Stark Avenue after running, though there was testimony that he was not an habitual jogger, and his work shoes would have been strange equipment for the five mile run he claimed to have made. He exhibited a roll of bills consistent with possession of the money taken from the pharmacy, and a bag similar to the pharmacy's bag turned up in the garbage at 90 Stark Avenue the day of the robbery. He expressed a wish to leave Dover and did so. If the testimony of his mother and the police officer was accurate, he would not have known that the police wished to question him about an armed robbery unless he had committed it. He asked one person to lie to provide an alibi defense, and he asked another to suppress the truth about the money he had

and about his strange behavior in returning to 90 Stark Avenue on the day after the robbery.

In summary, we find the exculpatory evidence of slight weight and in no sense rationally inconsistent with the jury's conclusion of guilt. The evidence viewed favorably to the State supports the verdict beyond a reasonable doubt. Finding no error, we affirm the judgment of conviction.

*Affirmed.*

All concurred.