Strafford
No. 87-184

# THE STATE OF NEW HAMPSHIRE

v.

# JOHN SULLIVAN

December 12, 1988

*Stephen E. Merrill*, attorney general (*Andrew W. Serell*, assistant attorney general, on the brief and orally), for the State.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J.   After a bifurcated trial, a superior court jury first found the defendant, John Sullivan, guilty of the second degree murder of Lynne Rousseau and the first degree murder of Harry Pike, and then rejected Sullivan's insanity defense, thereby affirming the guilty verdicts arrived at earlier. Sullivan appeals his convictions on the grounds that the Trial Court (*Nadeau, J.*) erred in denying both his motion for a mistrial, which argued that the State had improperly introduced character evidence that Sullivan was violent and a misogynist, and his motion to dismiss the first degree murder charge, which argued that there was insufficient evidence of premeditation and deliberation to support that charge. Sullivan also argues that New Hampshire's insanity rule denies due process because it lacks a standard that can guide a jury during deliberations and because a finding of sanity is not, therefore, subject to meaningful appellate review. We affirm.

The essential facts are as follows. John Sullivan lived in and managed a multi-family house in Farmington owned by his brother and sister-in-law. In March, 1985, he became acquainted with Harry and Mildreth Pike, who lived in the house next door with their daughter, Lynne Rousseau, and Rousseau's twelve-year-old daughter Melissa. Sullivan and Rousseau went out to dinner shortly after they met. However, according to Rousseau's mother's testimony, Rousseau told her mother after that date, that she would not have a second date with Sullivan because "there was something strange about him." Nonetheless, Sullivan, Rousseau, and Melissa did go out to dinner two or three months later. These two occasions were the only formal dates between Sullivan and Rousseau; however, it is unclear whether they spent additional time together. Mrs. Pike testified that Rousseau "didn't want to have anything to do with [Sullivan]," but Sullivan testified that Rousseau had visited him at his apartment on approximately eight occasions and that they had had sexual relations on those occasions.

In September, 1985, Sullivan went to the Pikes' home, while intoxicated, to see Lynne Rousseau, who was not at home. Sullivan waited for her, and when Rousseau returned home and asked him to leave, he began to yell at her, using profane language. Although he left shortly thereafter, he proceeded to call Rousseau on the telephone repeatedly, speaking to her on three separate occasions that evening. Sullivan later positioned himself outside the Pikes' house and yelled at Rousseau, prompting the Pikes to call the police.

Sullivan subsequently informed Mrs. Pike that he did not want Lynne Rousseau to set foot on his property. When Rousseau thereafter visited a friend who lived in the apartment house that Sullivan managed, he filed a criminal trespass complaint against her, although he later dropped it. In November or December, 1985, Sullivan told the Pikes and Rousseau that he wanted to forget their past disputes and have an amicable relationship with them in the future. Sullivan apparently had little contact with the Pikes and Rousseau between the late fall of 1985 and February 8, 1986.

On the evening of February 8, Sullivan telephoned Rousseau, who told him to go to bed. Shortly thereafter, he knocked on the back door of the Pike home, whereupon Rousseau let him in and they conversed briefly in the kitchen. Sullivan then entered and stood briefly in the doorway between the kitchen and living room, with his hands in his pockets, and looked back and forth at Mrs. Pike and Melissa, who were watching television in the living room. Rousseau grabbed Sullivan by the arm, saying, "Come on, John. My father's in bed. Go home." Sullivan and Rousseau then returned to the kitchen, where Rousseau again asked him to leave, indicating that she needed to go to the bathroom. Sullivan replied, "O.K. You have two seconds to go to the bathroom." Mrs. Pike then heard the door to the kitchen entrance open and close, followed by sounds that she described as two "pops." She heard her daughter scream and her husband emerge from his bedroom. Harry Pike appeared in the doorway to his bedroom adjacent to the kitchen and exclaimed, "Oh my God! He shot her!"

Mrs. Pike heard footsteps approaching the living room, quickly got up from the couch and, along with her husband and Melissa, ran upstairs. When she reached the top of the stairs, Mrs. Pike, who was behind Melissa but in front of her husband, felt Mr. Pike's hand leave her back and heard two shots. Thinking that she had been shot, Mrs. Pike dragged herself into Lynne Rousseau's bedroom, while Melissa hid in her own bedroom. Shortly thereafter, Melissa saw Sullivan running toward his garage, whereupon she went downstairs and called the police at 10:11 p.m.

At approximately 11:30 p.m., Tilton police officers Adam Roy and Owen Wellington observed Sullivan's dark-colored Nissan 300 ZX weaving in and out of its lane and alternately accelerating and decelerating between 45 and 55 mph on Interstate Route 93 southbound. The officers stopped Sullivan's car and arrested him for DWI. They recovered from his person twelve unspent .35 caliber rounds and a Smith and Wesson revolver. At 12:15 a.m., Sullivan took a breathalyzer test that indicated that his blood alcohol level was .22. A blood sample taken at 1:35 a.m. indicated a blood alcohol level of .20.

After the jury found Sullivan guilty of the second degree murder of Lynne Rousseau and the first degree murder of Harry Pike, and rejected his insanity defense, the trial court sentenced him to thirty-five years to life on the second degree murder charge and to life imprisonment without the possibility of parole on the first degree murder charge.

Sullivan argues, first, that the trial court erred in denying his motion for a mistrial because the court allowed the introduction by the State of evidence of the defendant's bad character in violation of New Hampshire Rule of Evidence 404. Specifically, Sullivan contends that the trial court permitted the State to ask Sullivan during cross-examination whether he was a violent person, whether he had an unfavorable opinion of women, whether he believed women were only useful for sex and whether his principal interests were drinking and pursuing women, thereby placing Sullivan's character into evidence in order that the jury would conclude that, in killing Rousseau and Pike, Sullivan had acted consistently with his character. The State contends that the court was correct in denying Sullivan's motion and that no violation of Rule 404 occurred because the State did not introduce evidence of Sullivan's propensities for violence and misogyny in order to prove that he had acted in conformity with those propensities on February 8, 1986, but rather to rebut his testimony that he was not a violent person and that he had sought a "well-rounded relationship" with Lynne Rousseau, despite her sole interest in a sexual liaison. We agree with the State.

New Hampshire Rule of Evidence 404(a) states that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion." However, Rule 404(a)(1) states an exception to the above rule and permits the admission of "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." Similarly, Rule 404(b)

states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith," but then proceeds to state that "[i]t may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Moreover, the defendant, by presenting certain evidence, may "open the door" to the introduction of otherwise inadmissible evidence for the limited purpose of impugning the veracity of the witness presented by the defendant. *See State v. Pugliese*, 129 N.H. 442, 529 A.2d 925 (1987); *State v. Judkins*, 128 N.H. 223, 512 A.2d 427 (1986); *State v. Brown*, 125 N.H. 346, 480 A.2d 901 (1984). Opening the door occurs "when one party introduces evidence that provides a justification beyond mere relevance for an opponent's introduction of otherwise inadmissible evidence." *State v. Crosman*, 125 N.H. 527, 530, 484 A.2d 1095, 1097 (1984). By means of this mechanism, "a misleading advantage may be countered with previously suppressed or otherwise inadmissible evidence." *Id.* at 531, 484 A.2d at 1098.

Furthermore, a mistrial is warranted, absent prosecutorial violation of a prior court ruling excluding certain evidence, only when that evidence is "inadmissible and both preponderantly and irremediably prejudicial." *State v. Elbert*, 125 N.H. 1, 13, 480 A.2d 854, 861 (1984).

In this case, the State's cross-examination of Sullivan regarding Sullivan's propensity for violence and his attitude toward women was admissible under the exception contained in Rule 404(a)(1) because the evidence elicited from that cross-examination was presented not to prove that Sullivan had acted in conformity with a character trait in killing Rousseau and Pike, but rather, to refute the impressions created by his earlier testimony that (1) he was incapable of committing such violent acts and (2) he wanted a "well-rounded relationship" with Lynne Rousseau, but she wanted their relationship to be purely sexual.

When asked during direct examination whether, at the time of his arrest on murder charges, he thought he had killed anyone, Sullivan testified, "Absolutely not. It was just totally unbelievable to me." This testimony suggested that Sullivan believed himself to be incapable of committing violent offenses of the type with which he was charged. Therefore, it was acceptable for the State to ask Sullivan whether he was a violent person generally and whether he was a violent person when intoxicated. An affirmative answer

to either question or to both (indeed, Sullivan did answer the latter question in the affirmative) would have cast substantial doubt on the veracity of his testimony that he found the charge that he could commit such acts to be "totally unbelievable."

Similarly, when Sullivan presented the testimony of Dr. Albert Drukteinis, who opined that Sullivan's intoxicated state on the night of the murders rendered him incapable of the premeditation and deliberation necessary for first degree murder, he further opened the door to the introduction by the State of evidence that showed that Sullivan was inclined to be violent when drunk and was well aware of this inclination. This evidence is admissible because it was introduced for the purposes of impugning the credibility not only of Sullivan's testimony about his disinclination to violence, but also of Dr. Drukteinis' testimony about Sullivan's diminished cognitive capacity on the night of the murders.

The character evidence introduced by the prosecution that Sullivan was prone to violent behavior when intoxicated was also admissible under Rule 404(b) because it was introduced for the purpose of proving intent. Under these circumstances, evidence concerning Sullivan's propensity for violence when intoxicated and his awareness of that propensity is highly probative, but not prejudicial. What was said in *United States v. Shaw*, 701 F.2d 367, 386, *reh'g denied*, 714 F.2d 544 (5th Cir. 1983), is applicable here:

> "[T]here is no showing that the government was attempting to convince the jury that [the defendant] was a bad man. [The defendant's] propensity for aggression when drinking was probative of whether he possessed the requisite intent deliberately to shoot [the victim]. Whether [the defendant] became disproportionately aggressive while drinking had relevance to establishing an element of the crime charged—premeditation—as being more probable than it would have been without such evidence."

■ The State also acted well within the bounds of Rule 404(b)(1) when it cross-examined Sullivan concerning his attitude toward women. Sullivan had testified during direct examination that Lynne Rousseau "never told me that she didn't want to go out with me. She never said anything of the kind. I was frustrated. I wanted our relationship to be something more than physical." Therefore, the State's questions were an appropriate vehicle for establishing that Sullivan had not been candid when he stated that Rousseau had wanted only a sexual relationship with him, while he had sought "a more well-rounded relationship." An affirmative response

by Sullivan to any of the questions posed by the prosecution concerning his attitudes toward women, including the question that asked whether, between 1984 and 1986, his principal hobbies had been drinking and the pursuit of women, would have called into question the credibility of Sullivan's testimony regarding his hopes for a close relationship with Lynne Rousseau. Because the evidence that the prosecution introduced regarding Sullivan's propensities for violence when intoxicated and for misogyny was introduced by the State for the limited purposes of rebutting Sullivan's earlier testimony and of proving intent, it was admissible and non-prejudicial. *See State v. Allegra,* 129 N.H. 720, 729, 533 A.2d 338, 344 (1987).

■ "Moreover, this court will defer to the trial court's ruling on the admission of evidence, absent an abuse of discretion." *State v. Judkins,* 128 N.H. at 225, 512 A.2d at 429 (citing *State v. Nadeau,* 126 N.H. 120, 126, 489 A.2d 623, 627 (1985)). We hold that the trial court did not err in denying Sullivan's motion for a mistrial.

We also agree with the State that, even assuming that the aforementioned evidence was prejudicial to Sullivan and, ideally, should not have been admitted, the trial court cured any possible prejudicial effect by giving to the jurors limiting instructions that specified that they would not be permitted to use that evidence as the basis for a verdict. The court admonished the jurors that "the general character of the defendant is not in issue;" that "[y]ou can't base your verdict on any evidence you've heard about his relationship with other women;" and that "we're not here to inquire into [Sullivan's character] or to use that in any way." The court did state, regarding the character evidence, that "[i]f it has come in, it's come in in connection with people talking about intoxication and reasons for intoxication and things that happened as background." However, the court immediately added, "But you cannot base your verdict on that. We're not here to discuss that; we're not here to inquire into that or to use that in any way." There was no objection by the defendant to this charge. We conclude that the latter part of the statement was sufficient to cure any ambiguity that might have been created by the earlier part.

Next, Sullivan argues that the trial court erred in denying his motion to dismiss the charge of first degree murder in the death of Harry Pike because there was insufficient evidence to prove that the killing of Pike was premeditated and deliberate. The State counters that the trial court acted properly in rejecting Sullivan's motion for dismissal because there was more than enough evidence on the basis of which a rational juror could find that Sullivan acted

with premeditation and deliberation when he killed Pike. We agree with the State.

In determining whether sufficient evidence existed to convince a rational juror that a defendant acted with premeditation and deliberation, we have long relied upon specific factors that we identified in *State v. Greenleaf*, 71 N.H. 606, 614–15, 54 A. 38, 43 (1902).

> "The character of the weapon employed, the force and number of blows inflicted, the location and severity of the wounds, the place of the crime, previous remarks and conduct indicating preparation, subsequent acts and statements, and every circumstance having a legitimate bearing upon the subject, may be considered by the jury."

*Id.*; *see State v. Sadvari*, 123 N.H. 410, 413, 462 A.2d 102, 104 (1983).

The record establishes that there was sufficient evidence to convince a rational juror that the defendant acted with premeditation and deliberation. *See State v. Sadvari supra.* Sullivan employed a deadly weapon, a handgun, with which he shot Pike twice, firing the second shot from a very close range into Pike's front right side, where it penetrated his lung and then his vena cava, precipitating death due to blood loss. In order to get himself into position to fire that second shot, Sullivan pursued Pike from the kitchen into the living room. Because the fatal shot entered Pike's upper body at a sharply downward angle, the jury could reasonably have inferred that Pike fell as a result of the first shot and that Sullivan positioned himself above Pike's fallen body before firing the second shot. It would therefore have been reasonable for the jury to have inferred that Sullivan prepared himself to shoot Pike, albeit during a brief time period. Sullivan's conduct exhibited the elements of premeditation and deliberation that we have long recognized as necessary to prove first degree murder.

> "There must be not only intention to kill, but there must also be a deliberate and premeditated design to kill. Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is."

*State v. Greenleaf, supra* at 613–14, 54 A. at 42, *quoted in State v. Place*, 126 N.H. 613, 615–16, 495 A.2d 1253, 1255 (1985). A jury could reasonably conclude that Sullivan was motivated to shoot Pike by the fact that Pike had witnessed Sullivan's murder of Rousseau. Finally, after shooting Pike, Sullivan fled the murder scene; a jury could rationally conclude that this exhibited the desire to avoid apprehension that had also motivated him to shoot Pike.

■ Sullivan's decision to pursue Pike, his establishment of a firing position that would maximize the likelihood that the bullet fired would strike a vital organ, and his subsequent flight from the scene strongly indicate premeditation and deliberation, not an instinctive reaction. The trial court therefore properly rejected the defendant's motion to dismiss the charge of first degree murder.

■ Sullivan finally argues that New Hampshire's insanity rule denies due process because it lacks a standard that can guide a jury during deliberations and because a jury verdict of sanity is not subject to meaningful appellate review. The State responds that the New Hampshire rule provides that insanity is a question of fact for the jury and that it satisfies the requirements of due process. We considered and decided this issue in *State v. Abbott*, 127 N.H. 444, 503 A.2d 791 (1985). For the reasons discussed at length in *Abbott, supra* at 448–49, 503 A.2d at 794–95, we agree with the State's position that New Hampshire's insanity rule satisfies the requirements of due process.

We hold that the trial court committed no error in denying Sullivan's respective motions for a mistrial and for dismissal of the first degree murder charge against him in the death of Harry Pike, and that the New Hampshire insanity rule comports with the dictates of due process. We therefore affirm Sullivan's convictions for second and first degree murder.

*Affirmed.*

All concurred.