Sullivan v. Warden Cunningham, NHSP    CV-94-655-B    07/11/95

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


John J. Sullivan

    v.                                    Civil No. 94-655-B

Michael J. Cunningham, Warden
    New Hampshire State Prison


O R D E R


Pro se plaintiff, John Sullivan, brings a civil rights action against the warden of the New Hampshire State Prison and several prison staff members alleging violations of his First and Fourteenth Amendment rights. Pending before me are Sullivan's motions for a preliminary injunction to prevent prison officials from retaliating against him for filing and pursuing his suit in this court and related motions. For the following reasons, I deny Sullivan's motions for injunctive relief and for criminal contempt and sanctions.

## I.    BACKGROUND

Sullivan was serving a life sentence for murder[1] at the New Hampshire State Prison ("NHSP") when the following relevant events occurred. After working as a janitor in the prison

---

[1]    See State v. Sullivan, 131 N.H. 209, 212 (1988).

education center, Sullivan was employed as an inmate instructor for the fall 1994 term. He became acquainted with several prison staff members in the education center including defendant Gaye Fedorchak, the assessment and guidance coordinator of the department, and defendant William McGonagle, the director of the program. The nature and extent of Sullivan's relationship with Gaye Fedorchak is a disputed issue.

The parties agree that Sullivan gave Fedorchak, and another staff member, copies of some of his writing including his newspaper columns. Sullivan alleges that Fedorchak expressed an interest in him and in his writing and that she attempted to become sexually involved with him. Fedorchak denies any personal involvement with Sullivan and states that during the summer of 1994, before Sullivan began his teaching job, she agreed to read copies of his newspaper columns, which he left in her mailbox.

Fedorchak states that Sullivan's writing became increasingly personal, and that on October 12, 1994, she told him that he could no longer leave materials in her mailbox and could only communicate with her in writing via an inmate request slip. She sent a memo explaining her action to McGonagle on the same day. Sullivan states that he told Fedorchak on October 12 that he would no longer send her copies of his writing after telling her

2

on October 2 that she should see less of him.  Sullivan also states that he did not hear Fedorchak tell him to stop communicating with her through her mailbox.  He alleges that from that point forward, Fedorchak and McGonagle conspired to restrict his access to the main part of the education center office.

The parties agree that Sullivan put a note in Fedorchak's mailbox that precipitated a disciplinary write-up by Fedorchak on November 2, 1994.  Fedorchak wrote a disciplinary report on Sullivan for disobeying her order to communicate only through inmate request slips.  In response to Fedorchak's disciplinary report, McGonagle initially suspended Sullivan from his work in the education department on November 2, and then on November 16, he dismissed Sullivan from his job.  Sullivan refused to plead guilty to Fedorchak's disciplinary report, claiming that he did not receive her order.  The report was processed as a minor disciplinary, violation, and Sullivan was found guilty following a hearing held on November 18 and 21.  As punishment, he lost privileges for fifteen days and received five days in punitive segregation, suspended.  Prior to Fedorchak's disciplinary report, Sullivan states, and defendants do not dispute, that he had not received a disciplinary report during the eight and one-half years of his imprisonment.

On December 6, Sullivan wrote an inmate request slip to McGonagle in response to a notification from McGonagle that Sullivan would not be allowed to teach in the next quarter. McGonagle answered that he would not employ Sullivan in the education center for at least the next two quarters but suggested that Sullivan contact him prior to the July 1995 term. Sullivan sent McGonagle another slip on December 13, and attached a onepage letter to him addressing the dispute between Sullivan and Fedorchak and saying, "I guarantee no adverse publicity or court action if we can straighten this out." Sullivan also wrote, "As I said to a friend in Maine the other day, 'This is going to be the end of the bullshit - one way or another.' So, I'll go to court if I'm forced." McGonagle replied on December 14 that he would no longer consider employing Sullivan at all. Sullivan's letter and McGonagle's response proved to be the catalyst for subsequent events culminating in Sullivan's transfer from the prison.

In addition to permanently ending Sullivan's employment in the education center, McGonagle wrote a disciplinary report based on Sullivan's letter charging him with threatening, and extortion and blackmail. McGonagle wrote, "The portions I have highlighted are intimidative and threatening. I also believe he is using his

4

threats of court action and publicity in the press to extort a positive decision from me in my administrative capacity.[2] McGonagle wrote his report as a minor violation. A hearing was held on McGonagle's disciplinary report on December 22 before defendant Sergeant William Wilson.

Wilson states in his affidavit that Sullivan explained that he believed he was the victim of sexual harassment in the situation and mentioned the possibility of a lawsuit. He acknowledges that he suggested that Sullivan pursue his complaint through the prison grievance procedure instead. Wilson found Sullivan not guilty of threatening but guilty of the extortion and blackmail minor violation, and sentenced Sullivan to twentyfive days loss of privileges, twenty-five hours of extra duty, and five days of punitive segregation, suspended. Nevertheless, later the same day, December 22, Sullivan was moved from his

_____

[2] The copies of the letter provided to the court do not indicate what portions McGonagle highlighted. Testimony at the hearing indicated that the highlighted portions were as follows:
"I'm filing a criminal appeal and I don't need the other garbage - neither do you and especially Gaye and her husband.
"She failed to consider who she was dealing with in this situation.
"She is an ambitious woman, but she has to pick less formidable adversaries."
"As I said to a friend in Maine the other day." 'This is going to be the end of the bullshit - one way or another.'"

medium security housing into the Special Housing Unit ("SHU") for highest risk inmates, and was placed on Pending Administrative Review ("PAR") status.

Defendant Gregory Crompton, classification supervisor, held a hearing on Sullivan's classification on December 30, 1994. The classification board recommended that Sullivan be held as a C-3 status inmate in SHU pending his transfer to a prison in another state. In the comments on the reclassification score sheet dated December 30, 1994, the board noted that Sullivan was placed in SHU after being found guilty of "extortion, blackmail of female staff member." In his affidavit, Crompton explains that the board recommended transfer to an out-of-state prison because they believed that Sullivan posed a threat to Fedorchak.[3] Sullivan appealed the board's decision. As a result, Warden Cunningham reviewed Sullivan's file including some of his communications

---

[3] At the hearing, defense counsel represented that Sullivan was put in SHU based on the recommendation of an officer in the investigation unit after Fedorchak reported that an inmate told her that she was in physical danger from Sullivan. The warden testified that the investigation unit did not produce a report, however. The warden also testified that the decision to transfer Sullivan to SHU on December 22, 1994, was based on Fedorchak's report of an inmate's tip. Neither the defense objection to the preliminary injunction nor the warden's affidavit dated April 7, 1995, however, mentions a warning from an inmate informant and indicates that the decision to place Sullivan in SHU was based on the guilty finding at the hearing on December 22.

with Fedorchak and decided that Sullivan was a threat to Fedorchak's safety. On January 27, the board decided to reclassify Sullivan as a C-5 status inmate to be held in SHU until he was transferred as a C-3 status inmate to another institution. On March 24, 1995, Sullivan was transferred to the Old Colony Correctional Center in Bridgewater, Massachusetts ("OCCC").

Sullivan began his legal action in this court by filing a writ of habeas corpus in November 1994. On December 18, he asked that his civil complaint be substituted, and his complaint, dated December 18, was filed with the court on December 23, 1994. On the same day, Sullivan filed a motion for a temporary restraining order or a preliminary injunction. On February 22, 1995, Sullivan filed a supplemental complaint naming additional defendants. After review of his pleadings by the court, and some confusion about service, defendants were served on April 1, 1995, and then responded to Sullivan's motion for injunctive relief.

## II. DISCUSSION

In his motion for injunctive relief filed on December 23, 1994, Sullivan asserts that the defendants took disciplinary action against him and were threatening to transfer him out of

7

NHSP in retaliation for filing his civil rights suit. He asks the court to order the defendants "to immediately cease all threats, harassment, moves about and out of the confines of the New Hampshire State Prison and trumped up disciplinary write-ups." On December 28, Sullivan filed a supplemental motion for a TRO asking that defendants be ordered to return him to his C-3 status and housing prior to being taken to SHU and to return his property to him. In March, Sullivan was transferred from NHSP to OCCC. At the hearing, Sullivan modified his request for injunctive relief, in light of present circumstances, asking that he remain at OCCC unless I order him returned to the same C-3 status cell and bunk that he occupied at NHSP before he was transferred to SHU.

In response to the defendants' objection to his request for injunctive relief, Sullivan filed motions for contempt and sanctions against the defendants for intentionally misleading the court and filing false affidavits. I first address Sullivan's request for injunctive relief and then resolve the other pending motions.

A.   Preliminary Injunction

   To be successful in his request for injunctive relief,

Sullivan must show:

       (1)  that [he] will suffer irreparable injury if the
       injunction is not granted; (2) that such injury
       outweighs any harm which granting injunctive relief
       would infliction the defendant; (3) that [he] has
       exhibited a likelihood of success on the merits; and
       (4) that the public interest will not be adversely
       affected by the granting of the injunction.

Jackson v. Fair, 846 F.2d 811, 814-15 (1st Cir. 1988) (quoting

Planned Parenthood League of Massachusetts v. Bellotti, 641 F.2d

1006, 1006 (1st Cir. 1981).  To facilitate the analysis, I move

to the third step, the substantive heart of the matter, to decide

whether Sullivan has demonstrated a sufficient likelihood of

success on the merits of his claim of retaliatory transfer.[4]

       Sullivan does not have a Fourteenth Amendment liberty

interest in avoiding a transfer from New Hampshire to

Massachusetts.  See Sandin v. Conner, 1995 U.S. LEXIS 4069 *21-22

(June 19, 1995) (an inmate's Fourteenth Amendment liberty

interest in freedom from restraint is limited to restraints which

"impose[] atypical and significant hardship on the inmate in

_____

       [4]  Sullivan makes additional claims in his complaint.
However, I need not address his likelihood of success on these
claims since they do not pertain to his request for preliminary
injunctive relief.

relation to the ordinary incidents of prison life"); <u>Olim v. Wakinekona</u>, 461 U.S. 238, 247 (1983) (due process clause does not create a protectable liberty interest in avoiding interstate prison transfers because such transfers are "neither unreasonable nor unusual"). Nevertheless, he does have a First Amendment right not to be transferred or subjected to other adverse actions in retaliation for filing a lawsuit. <u>McDonald</u> v. Hall, 610 F.2d 16, 18 (1st Cir. 1979); <u>see also</u>, <u>Beauchamp v. Murphy</u>, 37 F. 3d 700, 710 (1st Cir. 1994) (Bownes S.J., dissenting), <u>cert. denied</u> 115 S.Ct. 1365 (1995). In order to prove such a claim, however, Sullivan will have to establish that retaliation was the motivating factor in the transfer decision. <u>McDonald</u>, 610 F.2d at 18. In other words, he must prove that he would not have been transferred but for defendants, retaliatory notice. <u>Id.</u> <u>see also</u> <u>Goff v. Burton</u>, 7 F.3d 734, 737 (8th Cir. 1993), <u>cert. denied</u> 114 S. Ct. 2684 (1994).

Sullivan's preliminary injunction request hinges on defendants, interpretation of Sullivan's December 13, 1994, letter. Although Sullivan claims that the letter merely threatens a lawsuit, defendants contend that they construed the letter in light of other evidence as an implicit threat to harm Fedorchak if Sullivan's demands were not met. Thus, they contend

10

that Sullivan was transferred for security reasons.  Sullivan cannot succeed with his preliminary injunction request unless he demonstrates that he is likely to disprove this contention at trial.

Although the question is a close one, I conclude that Sullivan is unlikely to be successful at trial in proving that he was transferred for exercising his First Amendment rights.  The warden approved Sullivan's reclassification and made the decision to transfer.  The warden states that he believed that Sullivan presented a physical threat to Fedorchak based primarily on his understanding of the letter Sullivan wrote to McGonagle interpreted in light of the circumstances surrounding Sullivan's crime.[5]  The warden claims that he read the letter to imply threats of physical harm to Fedorchak in addition to the threats of court action and publicity.  In addition, the warden noted that Fedorchak and McGonagle told him that an inmate had

_____

[5] Sullivan, 131 N.H. at 210-12, provides the following facts about Sullivan's crime.  He was convicted of second degree murder of a woman who lived next door to him and first degree murder of her father.  Sullivan initially had a social relationship with the woman, which deteriorated into abusive and harassing incidents.  Sullivan then told the woman and her family that he wanted to have an amicable relationship with them.  After several uneventful months, Sullivan called the woman one evening, went to her home, refused to leave, and then shot her and subsequently shot her father as he tried to escape from Sullivan.

11

approached Fedorchak and warned her that she was at risk from Sullivan. She interpreted the warning to mean that she was at risk of physical harm. The warden testified that he accepted Fedorchak's concern about her safety and decided that he had to take action to prevent Sullivan from any further contact with her. He testified that it was impractical to keep Sullivan as a C-3 status inmate separated from Fedorchak because the prison library and the education center were in the same building. Based on what he knew about the situation between Fedorchak and Sullivan and the practicalities imposed by prison facilities, the warden claims that he decided that Sullivan had to be transferred to a prison outside of New Hampshire and reclassified to maximum security, C-5, until he was transferred, to prevent him from having contact with Fedorchak.

I disagree with the warden's interpretation of Sullivan's letter, which I construe as a threat to bring a lawsuit rather than to harm Fedorchak. Nevertheless, I am persuaded that the defendants, primary motivation in transferring Sullivan was to protect Fedorchak from harm rather than to punish Sullivan for threatening a lawsuit. Accordingly, Sullivan has not demonstrated that he is likely to succeed in showing that he would not have been transferred but for defendants, desire to

12

retaliate against him for threatening court action and publicity. Therefore, I deny his request for a preliminary injunction to return him to NHSP.

B.    Motions for Sanctions and Contempt

In his motion for criminal contempt, Sullivan alleges that the defendants misled the court by asserting that the defendants reclassified and transferred him for security reasons. I disagree. As I have discussed above, the circumstances surrounding Sullivan's reclassification and transfer include grounds for a security concern. Sullivan also challenges the defendants, use of the draft version of the classification manual. The confusion about the classification manual was appropriately pointed out by Sullivan and the mistake was corrected at the hearing. I find no violation of the rules of professional conduct in defense counsel's use of exhibits and evidence in the defendants' objection to Sullivan's motion for a preliminary injunction.

Sullivan alleges in his motions for criminal contempt and for sanctions that all of the defendants were aware of his suit long before April 3, and that they were served with the complaint on February 15, 1995. He charges that statements in affidavits

13

submitted by the warden and defendant Crompton, in which each states that he did not learn of Sullivan's suit until the week of April 3, 1994, are perjury.

Although most, if not all, of the defendants knew that Sullivan threatened to sue and some may have seen his pleadings when they were mailed in December 1994, prison officials are aware that pro se complaints are reviewed by the court before service and that many fall by the wayside in the process. The defendants were not served with Sullivan's pleadings until April 1, 1995, despite Sullivan's efforts to complete service during February. Consequently, the fair meaning of the warden's and Crompton's statements in their affidavits is that they did not have actual notice of the commencement of the suit until they were served. In this context, I do not find that the defendants' statements were false. Sullivan's motions for contempt and sanctions are denied.

## Ill. <u>CONCLUSION</u>

For the foregoing reasons plaintiff's motions for injunctive relief (documents 2 and 3) are denied. Plaintiff's motions for criminal contempt and sanctions (documents 34 and 44) are denied.

14

Previous motions filed by plaintiff (documents 19, 24, 35, 38, 40, 41, 42, and 45) are denied as moot pursuant to the hearing held on May 8, 1995.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

July 11, 1995

cc:  Martin Honigberg, Esq.
     John Sullivan, pro se